[No. B191256. Second Dist., Div. Two. Nov. 14, 2007.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT A. CAMPOS, Defendant and Appellant.

[No. B192771. Second Dist., Div. Two. Nov. 14, 2007.]

THE PEOPLE, Plaintiff and Respondent, v.
WILLIAM EDWARD HOGAN, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for partial publication. The portions directed to be published are the introductory paragraphs, Factual Background, part II of the Discussion, and the Disposition.

■■■■■■■

COUNSEL

Edward J. Haggerty, under appointment by the Court of Appeal, for Defendant and Appellant Robert A. Campos.

Susan E. Nash, under appointment by the Court of Appeal, for Defendant and Appellant William Edward Hogan.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Steven D. Matthews, Shawn McGahey Webb and David F. Glassman, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**ASHMANN-GERST, J.**—Robert A. Campos (Campos) and William Edward Hogan, also known as Billy Hogan (Hogan), appeal from the judgments entered upon their convictions by jury of two counts of first degree murder (Pen. Code, § 187, subd. (a))[1] (counts 1 & 2), and one count of attempted murder (§§ 664, 187, subd. (a)) (count 3). Campos also appeals from his conviction of one count of being a felon in possession of a firearm (§ 12021, subd. (a)(1)) (count 6), and Hogan appeals from his conviction of one count of evading a peace officer (Veh. Code, § 2800.2, subd. (a)) (count 4). In connection with the murder counts, the jury found the driveby special circumstance (§ 190.2, subd. (a)(21)) and the multiple-murder special circumstance (§ 190.2, subd. (a)(3)) to be true. In connection with the attempted murder count, the jury found that the crime was committed willfully, deliberately and with premeditation (§ 664, subd. (a)). In connection with the murder and attempted murder counts, the jury found that Campos personally and intentionally discharged a firearm, within the meaning of section 12022.53, subdivision (d).

The trial court sentenced Campos to consecutive terms of life without the possibility of parole (LWOP) on the murder convictions, a consecutive life term with a minimum of seven years with the possibility of parole on the attempted murder conviction, and a term of 25 years to life on each of those convictions for the firearm use enhancement. It sentenced Hogan to two consecutive LWOP terms on the murder convictions, a consecutive life term with a minimum of seven years with the possibility of parole on the attempted murder conviction, and a concurrent term of two years on the willful evasion conviction.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

Defendants contend that (1) Judicial Council of California Criminal Jury Instructions (2006) CALCRIM No. 220 lowers the reasonable doubt standard below that required by due process by precluding the jury from considering the lack of evidence. Campos further contends that (2) CALCRIM No. 220 also lowers the reasonable doubt standard by failing to define the term "abiding conviction," (3) the "driveby" special circumstance is unconstitutional on its face and as applied under the due process and cruel and unusual punishment clauses of the United States Constitution, (4) the multiple-murder special circumstance is unconstitutional under the due process and cruel and unusual punishment clauses, (5) CALCRIM No. 226 invites jurors to consider matters outside the record by telling them to use their common sense and experience, in violation of defendant's constitutional rights to due process, a fair trial and confrontation, (6) CALCRIM No. 600 (a) erroneously states the law regarding the "kill zone" theory of attempted murder, and (b) is argumentative, (7) the district attorney committed prosecutorial misconduct, (8) the trial court deprived defendant of his constitutional right to counsel and abused its discretion by denying (a) his *Marsden*[2] motion, and (b) his *Faretta*[3] motion, (9) he suffered ineffective assistance of counsel by virtue of his counsel's (a) arguing against the competence and credibility of his own expert witness, and (b) failing to request expanded eyewitness jury instructions, (10) he was deprived of his due process right to a fair trial by virtue of cumulative error, and (11) imposition of the court security fee under section 1465.8 (a) violates the ex post facto clauses of the United States and California Constitutions, and (b) cannot be applied retroactively in the absence of a retroactivity provision. Additionally, Hogan contends that (12) the trial court prejudicially erred in admitting into evidence without foundation a note allegedly written by Hogan during a jailhouse visit, and (13) the trial court erred in denying his pretrial motion for severance and postconviction motion for new trial on the same grounds, thereby depriving him of due process and a fair trial.

We affirm.

## FACTUAL BACKGROUND

*The prosecution's evidence*

*The shooting*

On the evening of August 6, 2003, Amalia Rodriguez (Rodriguez) was out with her friend, Richard House (House), and House's friend, James Madden

---

[2] *People v. Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44].

[3] *Faretta v. California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525].

(Madden). House was driving Rodriguez's 1991 Ford Taurus, Rodriguez was in the front passenger seat and Madden sat in the back behind her. At approximately 11:00 p.m., they drove by the corner of Avenue J-8 and 12th Street West, in the City of Lancaster. Near that corner, Rodriguez noticed two men standing in the driveway of a house with a sheet hanging where the garage door should have been. A light was shining inside. Madden said to stop at the house, but House parked up the street instead. He made a telephone call and then made a U-turn and drove back the way they had come.

Living in the house with the hanging sheet was Randall Bramlett (Bramlett). On the evening of August 6, 2003, his friend, Hogan, stopped by and shot pool. At some point, they heard yelling outside. Bramlett looked outside and saw a man who resembled Campos, and whom he knew by the name Mousy, yelling at a passing car. Madden, inside the car, was yelling at Mousy. Bramlett was aware that Hogan and Madden had had some kind of dispute, but heard that they had resolved it and were on friendly terms. Hogan left the garage and stood in the driveway with Mousy. Hogan then returned to the garage, grabbed his backpack and ran outside. When the car made a U-turn and came back down the street, Bramlett told Hogan, "Not here." Hogan and Mousy entered a truck and followed the car to the end of the street, with Hogan driving and Mousy in the front passenger seat.

When House turned north on 12th Street West, a white pickup truck followed. When he slowed at a stop sign at Avenue J-8, Madden said, "You should have stopped because there they come." Rodriguez turned, looked over her shoulder and saw the headlights of a truck quickly approaching, with Campos hanging out of the front passenger window, wearing glasses and holding a gun. Hogan, who Rodriguez saw driving the truck, stopped within four to six feet of the rear of Rodriguez's car. Campos looked into the backseat of the car, then into the front seat, and again into the backseat and then began shooting. Rodriguez saw a gun flash, ducked under the glove compartment and covered her head with her hands. House tried to depress the gas pedal, but the car stalled and coasted to the next block.

When the shooting stopped, House said that he could not move and needed to go to the hospital. Rodriguez saw a bullet hole in the front of his temple and one behind his left ear. Madden was dead and covered with blood. Rodriguez was shot in her left arm, left side and right ankle. House died of multiple gunshot wounds to the head, lower back and right arm. Madden also died of multiple gunshot wounds, having been hit six times. Small bullet fragments were recovered from his body during the autopsy.

*Forensic evidence*

A Los Angeles County Sheriff's criminalist determined that the cartridge cases, bullets and bullet fragments recovered from the scene of the shooting, from Rodriguez's vehicle, and from the victims were fired from the gun subsequently confiscated from Campos.

*Campos's admissions*

In early 2003, Cynthia Moore (Moore) met Campos, whom she referred to as Mousy, when she and a friend purchased drugs from him. In August or September 2003, after Moore learned of House's and Madden's murders, Campos entered a house where she was staying and tried to change the ballistics on his gun by scraping the inside of the barrel. On a second occasion, Moore saw Campos at a "flop house." He got into an argument with someone, waved his gun and boasted that he had already killed House and Madden and did not care about killing anyone else. Later, Campos became angry when he learned that Moore was telling people that he had killed House and Madden. He approached her while she was sleeping, and sprayed Mace on her. When she awoke, he was waving the gun and threatening to shoot her if she did not leave.

On August 30, 2003, Campos was taken into custody for possessing a firearm at the Pitchess Detention Center. When Deputy Sheriff, Sergeant Scott Gibson, interviewed him, Campos admitted that the gun found in his car was his. He claimed to have purchased it a month earlier for $200 from a man on a street in Lancaster. The parties stipulated that Campos had a prior felony conviction.

*Hogan's apprehension*

After Hogan was identified as being involved in the shooting, as detailed in part V.B.1., *post*, law enforcement authorities were advised to be on the lookout for him. On August 15, 2003, approximately 1:20 p.m., Deputy Sheriff Mark Dunkel, in a marked patrol car in Lancaster, received a call regarding a nearby pursuit of a black Volkswagen. He saw the car coming towards him, did a U-turn, turned on his lights and siren and followed. The car ran a stop sign and drove at a high rate of speed through a residential area. The car abruptly stopped, and Hogan exited with a gun in his hand. He ran between some houses, dropping the gun on the way. Deputy Dunkel lost sight of him. Shortly after, he saw Hogan walking towards two deputies. When arrested, Hogan had two loaded guns in his possession, a .38-caliber revolver, which he dropped when he ran, and a derringer found in his car. At trial, Deputy Dunkel identified a picture of Hogan as the person who was arrested, but could not identify him in court because Hogan "look[ed] totally different."

*The defense's evidence*

Kimi Scudder testified for Campos as a gang expert. She claimed to be familiar with gang members' habits in disposing of guns. She testified that Campos admitted gang membership. After using a gun in a violent crime, gang members "pass them off or sell them" like a "hot potato" within one to three days. She opined that it was highly unlikely that a gang member would retain a gun he used to commit a violent crime.

Hogan called Dr. Mitchell Eisen, a Ph.D. in psychology, as an expert witness on memory and eyewitness identifications. Dr. Eisen testified about the fallibility of memory, and how people remember major features of important events and use inferences, which are sometimes inaccurate, to fill in the gaps. When they reconstruct or recall memories, they recall the most recently reconstructed version. The likelihood of memory error increases if a person is given misinformation shortly after the memory-causing incident because, as time passes, the person will mix the misinformation with the memory. Stress and trauma also affect the accuracy of a person's memory, intensifying the focus on some things, while causing a loss of focus on others.

Dr. Eisen further testified about the federal Department of Justice guidelines for conducting eyewitness identifications. Those guidelines recommend that a witness to a crime receive unbiased admonishments before attempting to identify a suspect's photograph in a six-pack lineup, stating that the perpetrator's photograph may not be in the six-pack, and that it is just as important that the witness not select a photograph if the witness does not recognize the perpetrator as it is to identify a person believed to be the perpetrator. The identification should be conducted by an officer who does not know who the suspect is in order to avoid the officer inadvertently transmitting clues to the witness. The identification of the perpetrator is more likely to be accurate if made shortly after the incident. The more time that passes, the greater the opportunity for inaccurate postevent information to intrude. There is no correlation between the accuracy of a person's memory and a person's confidence in the accuracy of the memory.

Hogan also called Henry Hall, his initial public defender in this case, who testified that the dark handwriting on a note confiscated from Hogan after his jailhouse visit with his girlfriend, summarizing the case name and number and charges, was Hall's. He gave the document to Hogan, but did not recognize the additional writing on the note that was in pencil.

## DISCUSSION

## I

## CONSTITUTIONALITY OF SPECIAL CIRCUMSTANCES*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## II

## INSTRUCTIONAL ERRORS

### A. *Forfeiture*[6]

Defendants challenge CALCRIM No. 220 on the ground that it limited the jury's consideration of the lack of evidence. Campos additionally challenges it on the ground that it insufficiently defines reasonable doubt as "abiding conviction." He also challenges CALCRIM No. 226 on the ground that it encourages jurors to consider matters outside of the evidence, and CALCRIM No. 600 on the grounds that it erroneously defines the "kill zone" concept and is argumentative. At no time did defendants object in the trial court to any of the jury instructions or request any limitation, modification or clarification of them. The People contend that these issues have been forfeited for failure to raise them in the trial court. We agree.

■ Generally, ' "[a] party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language." ' (*People v. Hart* (1999) 20 Cal.4th 546, 622 [85 Cal.Rptr.2d 132, 976 P.2d 683]; see *People v. Guerra* (2006) 37 Cal.4th 1067, 1134 [40 Cal.Rptr.3d 118, 129 P.3d 321]; *People v. Gonzalez* (2002) 99 Cal.App.4th 475, 483 [121 Cal.Rptr.2d 279].) Defendants' challenges to the clarity and completeness of the instructions are therefore forfeited. Moreover, as discussed below, even if the objections had been preserved for appeal, we would nonetheless reject them.

---

*See footnote, *ante*, page 1228.

[6] While the People use the term "waiver" in reference to defendants' failures to preserve their instructional claims for appeal because they did not raise them in the court below, the correct term which we use in this opinion is " 'forfeiture.' " " '[W]aiver' " is the express relinquishment of a known right whereas " 'forfeiture' " is the failure to object or to invoke a right. (*In re Sheena K.* (2007) 40 Cal.4th 875, 880, fn. 1 [55 Cal.Rptr.3d 716, 153 P.3d 282].)

## B. *CALCRIM No. 220*

The trial court instructed the jury in accordance with CALCRIM No. 220 that the defendant is presumed innocent unless each element of the crime is proven beyond a reasonable doubt. It defined proof beyond a reasonable doubt as proof that leaves the jury with an "abiding conviction" that the charge is true, and that such doubt is determined by "compar[ing] and consider[ing] all the evidence that was received throughout the entire trial."[7] The trial court also instructed, in accordance with CALCRIM No. 222, that evidence is witnesses' testimony, admitted exhibits, and what the judge says may be considered.

### 1. *Limiting consideration of lack of evidence*

Defendants contend that CALCRIM No. 220 precluded the jury from considering the lack of evidence in determining whether a reasonable doubt existed, thereby violating due process by allowing the jury to find guilt by less than the beyond a reasonable doubt standard. They argue that read together, the language in CALCRIM No. 220, that the jury must consider "all the evidence that was received throughout the entire trial," and the language in CALCRIM No. 222, that evidence is sworn testimony, admitted exhibits and what the trial court tells the jury to consider, "limited the jury's determination of reasonable doubt to the evidence *received* at trial and precluded it from considering the lack of physical evidence tying [defendant] to the offenses, . . . " such as the lack of gunshot residue and fingerprints. This contention is without merit.

In determining the correctness of jury instructions, we consider the instructions as a whole. (*People v. Carrasco* (2006) 137 Cal.App.4th 1050, 1061 [40 Cal.Rptr.3d 768].) An instruction can only be found to be ambiguous or misleading if, in the context of the entire charge, there is a reasonable likelihood that the jury misconstrued or misapplied its words. (*People v. Frye* (1998) 18 Cal.4th 894, 957 [77 Cal.Rptr.2d 25, 959 P.2d 183].)

---

[7] CALCRIM No. 220 as given states: "The fact that a criminal charge has been filed against the defendant is not evidence that the charge is true. You must not be biased against the defendants just because they have been arrested, charged with a crime, or brought to trial. [¶] A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove each element of the crime and special allegation beyond a reasonable doubt. Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt. [¶] Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt. [¶] In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial. Unless the evidence proves each defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty."

■ Reasonable doubt may arise from the lack of evidence at trial as well as from the evidence presented. (*People v. Simpson* (1954) 43 Cal.2d 553, 566 [275 P.2d 31] (*Simpson*).) The plain language of CALCRIM No. 220 does not instruct otherwise. The only reasonable understanding of the language, "[u]nless the evidence proves the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty," is that a lack of evidence could lead to reasonable doubt. Contrary to defendants' claim, CALCRIM No. 220 did not tell the jury that reasonable doubt must arise from the evidence. The jury was likely "to understand by this instruction the almost self-evident principle that the determination of defendant's culpability beyond a reasonable doubt . . . must be based on a review of the evidence presented." (*People v. Hawkins* (1995) 10 Cal.4th 920, 963 [42 Cal.Rptr.2d 636, 897 P.2d 574], abrogated on another ground in *People v. Lasko* (2000) 23 Cal.4th 101, 110 [96 Cal.Rptr.2d 441, 999 P.2d 666]; see also *People v. Hernández Ríos* (2007) 151 Cal.App.4th 1154, 1157 [60 Cal.Rptr.3d 591].)

Defendants rely on *Simpson, supra,* 43 Cal.2d 553 and *People v. McCullough* (1979) 100 Cal.App.3d 169 [160 Cal.Rptr. 831] (*McCullough*), which cites *Simpson.* These cases are inapposite. In *Simpson,* the defendant argued that the trial court's instruction on reasonable doubt had shifted the burden to him to prove his innocence. The trial court instructed, " 'The term "reasonable doubt," as used in these instructions, means a doubt which has *some good reason* for its existence *arising out of evidence in the case;* such doubt as you are able to find a *reason for in the evidence.*' " (*Simpson, supra,* at p. 565, fns. omitted.) The Supreme Court held this language was "not necessary" and "could have been confusing" because "reasonable doubt . . . may well grow out of the lack of evidence in the case as well as the evidence adduced." (*Id.* at p. 566.) Similarly, in *McCullough,* the Court of Appeal found a supplemental instruction which stated that the doubt must arise from the evidence to be erroneous. (*McCullough, supra,* at p. 182.)

Here, unlike in *Simpson* or *McCullough,* the instruction did not tell the jury that the reasonable doubt had to arise out of the evidence in the case. It merely said that the jury was to consider all of the evidence presented.

### 2. *Abiding conviction*

CALCRIM No. 220 defines proof beyond a reasonable doubt as proof that leaves one with an "abiding conviction." Campos contends that a clarifying instruction defining "abiding conviction" was required because "the phrase 'abiding conviction' is . . . so archaic and generally disused, it is likely to be beyond the understanding of the average juror." The jury therefore lacked guidance as to the standard of proof necessary to establish guilt, leaving open

the possibility that it deprived Campos of due process by finding him guilty by less than the beyond a reasonable doubt standard. This contention is meritless.

The definition of reasonable doubt in CALCRIM No. 220 is derived from CALJIC No. 2.90 which in turn was taken directly from the language of section 1096 which, when given, requires "no further instruction . . . defining reasonable doubt . . . ." (§ 1096a.) In *Victor v. Nebraska* (1994) 511 U.S. 1, 14–15 [127 L.Ed.2d 583, 114 S.Ct. 1239], the United States Supreme Court sustained the then language of CALJIC No. 2.90, and stated: "An instruction cast in terms of an abiding conviction as to guilt, without reference to moral certainty, correctly states the government's burden of proof."

The California Supreme Court has also rejected similar challenges to the "abiding conviction" language. Just last year, in *People v. Cook* (2006) 39 Cal.4th 566, 601 [47 Cal.Rptr.3d 22, 139 P.3d 492], it rejected a claim that CALJIC No. 2.90's " 'an abiding conviction to a moral certainty' " language eroded the reasonable doubt standard. (See also *People v. Heard* (2003) 31 Cal.4th 946, 980 [4 Cal.Rptr.3d 131, 75 P.3d 53] [rejecting defendant's claim that the reasonable doubt instruction in CALJIC No. 2.90 is " 'hopelessly confusing' "]; *People v. Freeman* (1994) 8 Cal.4th 450, 501–505 [34 Cal.Rptr.2d 558, 882 P.2d 249] [defining beyond a reasonable doubt by use of "abiding conviction" was proper].) *Freeman* cautioned against departing from the "abiding conviction" language. (*Freeman, supra,* at p. 505.)

The Courts of Appeal in every appellate district have also consistently rejected similar claims (*People v. Hearon* (1999) 72 Cal.App.4th 1285, 1286 [85 Cal.Rptr.2d 424]), leading one Court of Appeal to comment: "We regard the issue as conclusively settled adversely to defendant's position. [Citation.] [¶] The time has come for appellate attorneys to take this frivolous contention off of their menus." (*Id.* at p. 1287.)

In light of this impressive and controlling array of legal authority, we find no compelling reason to revisit this issue. Moreover, we caution the Bar that adoption of the Judicial Council of California Criminal Jury Instructions is not an excuse for advocates to dust off the old, hackneyed arguments that were thoroughly discredited under similarly worded CALJIC instructions and recycle them before this court.

### C. *CALCRIM No. 226*

The trial court instructed the jury in accordance with CALCRIM No. 226, in part, as follows: "You alone must judge the credibility or believability of

the witnesses. In deciding whether testimony is true and accurate, use your common sense and experience. The testimony of each witness must be judged by the same standard. You must set aside any bias or prejudice you may have, including any based on the witness's gender, race, religion, or national origin. You may believe all, part, or none of any witness's testimony. Consider the testimony of each witness and decide how much of it you believe."

Campos contends that CALCRIM No. 226 invites the jury to consider matters outside the record in violation of his constitutional rights to due process, a fair trial and confrontation. He argues that the language, "use your common sense and experience," is subjective and encourages consideration of outside evidence and/or employment of a standard less than proof beyond a reasonable doubt, as "common sense" "can be used as a substitute for objective (and substantial) evidence of guilt." We disagree. When the instructions here are considered as a whole, it is not reasonably likely that the jury would understand CALCRIM No. 226 to mean what Campos claims. (*People v. Frye, supra*, 18 Cal.4th at p. 957.)

■ To tell a juror to use common sense and experience is little more than telling the juror to do what the juror cannot help but do. In approaching any issue, a juror's background, experience and reasoning must necessarily provide the backdrop for the juror's decisionmaking, whether instructed or not. CALCRIM No. 226 does not tell jurors to consider evidence outside of the record, but merely tells them that the prism through which witnesses' credibility should be evaluated is common sense and experience. Unlike *People v. Bickerstaff* (1920) 46 Cal.App. 764, 773 [190 P. 656] and *People v. Paulsell* (1896) 115 Cal. 6, 7 [46 P. 734], cited by Campos, CALCRIM No. 226 does not instruct jurors to use their common sense and experience in finding reasonable doubt, which could potentially conflict with the beyond a reasonable doubt standard, but only in assessing a witnesses' credibility.

Furthermore, other instructions given to jurors make clear that the term "common sense and experience" is not a license to consider matters outside of the evidence. Jurors were instructed that they must decide the facts based on the evidence presented (CALCRIM No. 200), that they were not to conduct research or investigate the crime (CALCRIM No. 201), that their determination of guilt had to be based on evidence received at trial (CALCRIM No. 220), that they were only to consider evidence (sworn testimony and exhibits) presented in the courtroom (CALCRIM No. 222), that they had to decide whether facts have been proved based on "all the evidence" (CALCRIM No. 223), that they should review all the evidence before concluding that the testimony of one witness proves a fact (CALCRIM No. 301) and other instructions emphasizing the exclusive significance of the evidence (CALCRIM No. 302).

## D. *CALCRIM No. 600*

The jury was instructed in accordance with CALCRIM No. 600, in part, as follows: "A person may intend to kill a specific victim or victims and at the same time intend to kill anyone in a particular zone of harm or 'kill zone.' In order to convict a defendant of the attempted murder of Amalia Rodriguez, the People must prove that the defendant or perpetrator not only intended to kill Richard House or James Madden but also either intended to kill Rodriguez or intended to kill anyone within the kill zone. If you have a reasonable doubt whether the defendant intended to kill Rodriguez or intended to kill House or Madden by harming everyone in the kill zone, then you must find the defendant not guilty of attempted murder."[8]

### 1. *Improper "kill zone" definition*

Campos contends that the quoted portion of CALCRIM No. 600 is erroneous. He argues that *People v. Bland* (2002) 28 Cal.4th 313, 330 [121 Cal.Rptr.2d 546, 48 P.3d 1107] (*Bland*), which established the "kill zone" concept, defined "kill zone" as a zone in which the defendant intends to kill "*everyone*" to ensure harm to a target victim. CALCRIM No. 600 defines the "kill zone" as *the zone in which the defendant intends to kill "anyone."* By using the word "anyone" instead of "everyone," Campos claims that the instruction improperly expands the *Bland* "kill zone" concept and permits finding guilt of attempted murder without proof that all members of the group were subjected to the risk of death, and, consequently, without the intent to kill all group members. This contention is meritless.

---

[8] CALCRIM No. 600 as given, states in its entirety: "The defendants are charged in Count 3 with attempted murder, a violation of Penal Code 664/187(a). To prove that a defendant is guilty of attempted murder, the People must prove that: [¶] 1. The defendant or perpetrator took at least one direct but ineffective step toward killing another person; and [¶] 2. The defendant or perpetrator intended to kill that person. [¶] A *direct step* requires more than merely planning or preparing to commit murder or obtaining or arranging for something needed to commit murder. A direct step is one that goes beyond planning or preparation and shows that a person is putting his plan into action. A direct step indicates a definite and unambiguous intent to kill. It is a direct movement toward the commission of the crime after preparations are made. It is an immediate step that puts the plan in motion so that the plan would have been completed if some circumstance outside the plan had not interrupted the attempt. [¶] A person may intend to kill a specific victim or victims and at the same time intend to kill anyone in a particular zone of harm or 'kill zone.' In order to convict a defendant of the attempted murder of Amalia Rodriguez, the People must prove that the defendant or perpetrator not only intended to kill Richard House or James Madden but also either intended to kill Rodriguez or intended to kill anyone within the kill zone. If you have a reasonable doubt whether the defendant intended to kill Rodriguez or intended to kill House or Madden by harming *everyone* in the kill zone, then you must find the defendant not guilty of attempted murder."

 Attempted murder requires proof of a direct but ineffectual act done towards killing another human being and the specific intent to unlawfully kill another human being. (*People v. Herrera* (1999) 70 Cal.App.4th 1456, 1466–1467 [83 Cal.Rptr.2d 307] [citing CALJIC No. 8.66 with approval].) Unlike the mental state for murder, which does not require an intent to kill but only a conscious disregard for life (implied malice), " '[a]ttempted murder requires the specific intent to kill . . . .' " (*People v. Smith* (2005) 37 Cal.4th 733, 739 [37 Cal.Rptr.3d 163, 124 P.3d 730].) The doctrine of "transferred intent," transferring the intent to kill an intended target to an unintended victim, applies to murder but not to attempted murder. (*Bland, supra,* 28 Cal.4th at pp. 320–321, 331.)

While holding that transferred intent does not apply to attempted murder, the California Supreme Court in *Bland* stated that there could still be a concurrent intent such that "a person who shoots at a group of people [may still] be punished for the actions towards everyone in the group even if the person primarily targeted only one of them. . . ." (*Bland, supra,* 28 Cal.4th at p. 329.) *Bland* concluded that a concurrent intent can be found when there is a "kill zone" created, that is, " 'when the nature and scope of the attack, while directed at a primary victim, are such that we can conclude the perpetrator intended to ensure harm to the primary victim by harming everyone in that victim's vicinity.' " (*Ibid.*) But *Bland* did not suggest that the "kill zone" was the only way to establish concurrent intent to kill more than one person in a fired-upon group.

" 'The act of firing toward a victim at a close, but not point blank, range "in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill . . . ." ' " (*People v. Smith, supra,* 37 Cal.4th at p. 741.) In *People v. Smith*, the defendant fired a single shot at a fleeing vehicle occupied by a male passenger, a female driver acquainted with the defendant, and a baby in a rear-facing car seat directly behind the driver. (*Id.* at p. 737.) "The bullet shattered the rear windshield, narrowly missed both [the female driver] and [her] baby, passed through the driver's headrest, and lodged in the driver's side door." (*Ibid.*) The defendant was convicted of the attempted murder of the female driver and of her baby. (*Id.* at p. 738.)

On appeal, the defendant argued that there was only proof of his specific intent to kill the female driver, but no proof of his specific intent to kill the baby. (*People v. Smith, supra,* 37 Cal.4th at pp. 736, 738.) In rejecting that argument, the Supreme Court explained that "in order for the jury to convict defendant of the attempted murder of the baby, it had to find, beyond a reasonable doubt, that he acted with intent to kill that victim, i.e., that he purposely shot into the vehicle with 'a deliberate intent to unlawfully take

away [the baby's] life' [citation] or knowledge that his act of shooting into the vehicle would, ' " 'to a substantial certainty,' " ' result in the baby's death. [Citation.] . . . Under the case law . . . , evidence that defendant purposefully discharged a lethal firearm at the victims, both of whom were seated in the vehicle, one behind the other, with each directly in his line of fire, can support an inference that he acted with intent to kill both. [Citations.]" (*Id.* at p. 743.)

We evaluate this challenge to CALCRIM No. 600 by determining whether there is a reasonable likelihood the jury misconstrued or misapplied its words. (*People v. Frye, supra,* 18 Cal.4th at p. 957.) There is no possibility that the jury here could have misapplied CALCRIM No. 600 so as to fail to find that defendant had the specific intent to kill Rodriguez. First, the jury was properly instructed on the elements of attempted murder, including the requirement of the specific intent to murder the person whose attempted murder is charged, and on express malice. (CALCRIM Nos. 520, 600.) These instructions were sufficient on the elements of the offense. The "kill zone" portion of CALCRIM No. 600 was superfluous. That theory "is not a legal doctrine requiring special jury instructions, as is the doctrine of transferred intent. Rather, it is simply a reasonable inference the jury may draw in a given case: a primary intent to kill a specific target does not rule out a concurrent intent to kill others." (*Bland, supra,* 28 Cal.4th at p. 331, fn. 6; see *People v. Smith, supra,* 37 Cal.4th at p. 746.)

Second, the "kill zone" instruction as given here, while ambiguous, is not necessarily inconsistent with *Bland*. While it states that proving defendant guilty of the attempted murder of Rodriguez requires proof that he intended to kill not only House or Madden, but Rodriguez or "*anyone within the kill zone*" (italics added), it adds, "If you have a reasonable doubt whether the defendant intended to kill Rodriguez or intended to kill House or Madden by harming *everyone* in the kill zone, then you must find the defendant not guilty of the attempted murder . . . ." (CALCRIM No. 600, italics added.) This language is consistent with *Bland* and directed the jury that it could not find Campos guilty of attempted murder of Rodriguez under a "kill zone" theory unless it found that he intended to harm "everyone" in the zone.

Third, in the context presented here, there is little difference between the words "kill anyone within the kill zone" and "kill everyone within the kill zone." In both cases, there exists the specific intent to kill each person in the group. A defendant who shoots into a crowd of people with the desire to kill anyone he happens to hit, but not everyone, surely has the specific intent to kill whomever he hits, as each person in the group is at risk of death due to the shooter's indifference as to who is his victim.

Even if the instruction was erroneous, the error was harmless in that it was not reasonably probable that if a correct instruction had been given a verdict more favorable to Campos would have resulted. (*People v. Palmer* (2005) 133 Cal.App.4th 1141, 1157 [35 Cal.Rptr.3d 373] [misdirection of the jury, including incorrect, ambiguous, conflicting, or wrongly omitted instructions that do not amount to federal constitutional error are reviewed under the harmless error standard articulated in *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]].) The evidence of Campos's intent to kill Rodriguez was overwhelming under the "kill zone" theory or otherwise. His truck approached the victims' car and stopped only four or five feet from it. He looked in the backseat, the front seat and the backseat again. After doing so, he sprayed the car with nearly a dozen bullets, from close range. On this evidence the jury would almost certainly have found intent by defendant to kill everyone inside. Also, shooting Rodriguez from close, but not point-blank range, in a manner that could have inflicted a mortal wound is sufficient to form an inference of intent to kill her. (See *People v. Smith, supra*, 37 Cal.4th at p. 743 ["evidence that defendant purposefully discharged a lethal firearm at the victims, both of whom were seated in the vehicle, one behind the other, with each directly in his line of fire, can support an inference that he acted with intent to kill both"].)

### 2. *Argumentative*

Campos contends that CALCRIM No. 600 is argumentative. He argues that the term "kill zone," like the terms "execution style" or "serial killer," is argumentative and inflammatory and therefore inappropriate in a neutral instruction. We disagree.

■ An instruction is argumentative when it recites facts drawn from the evidence in such a manner as to constitute argument to the jury in the guise of a statement of law. (*People v. Rice* (1976) 59 Cal.App.3d 998, 1004 [131 Cal.Rptr. 330].) "A jury instruction is [also] argumentative when it is ' "of such a character as to invite the jury to draw inferences favorable to one of the parties from specified items of evidence." [Citations.]' " (*People v. Lewis* (2001) 26 Cal.4th 334, 380 [110 Cal.Rptr.2d 272, 28 P.3d 34].)

■ CALCRIM No. 600 merely employs a term, "kill zone," which was coined by our Supreme Court in *Bland* and referred to in later California Supreme Court cases. (See *People v. Smith, supra*, 37 Cal.4th 733.) It does not invite inferences favorable to either party and does not integrate facts of this case as an argument to the jury. Other disparaging terms, including "flight" (CALJIC No. 2.52), "suppress[ion] of evidence" (CALJIC No. 2.06) and "consciousness of guilt" (CALJIC No. 2.03) have been used in approved, longstanding CALJIC instructions. We see nothing argumentative in this instruction.

## III–IX[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgments are affirmed.

Doi Todd, Acting P. J., and Chavez, J., concurred.

On November 15, 2007, and December 7, 2007, the opinion was modified to read as printed above. The petitions of both appellants for review by the Supreme Court were denied February 27, 2008, S158772. George, C. J., and Corrigan, J., did not participate therein.

---

[*]See footnote, *ante*, page 1228.