Filed 12/21/15  P. v. Garda CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR


| | |
|---|---|
| THE PEOPLE, | B260484 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. VA134736) |
| v. | |
| JAMES ROBERT GARDA, | |
| Defendant and Appellant. | |


APPEAL from a judgment of the Superior Court of Los Angeles County, Roger T. Ito, Judge.  Affirmed.

Christian C. Buckley, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Zee Rodriguez and Andrew S. Pruitt, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found defendant James Garda guilty of felony evasion of a police officer. (Veh. Code, § 2800.2, subd. (a).)[1]  At the request of the prosecution, and without objection from defendant, the court instructed the jury that "[t]he statute defining the offense of flight from a pursuing peace officer does not require that the pursuing officer continuously activate the emergency lights and siren where there is but one pursuit." Defendant now contends this pinpoint instruction was inaccurate and argumentative.  We disagree and affirm.

## PROCEDURAL HISTORY

On June 11, 2014, the District Attorney of the County of Los Angeles ("the People") filed an information charging defendant with one felony count of driving in willful or wanton disregard for safety of persons or property while fleeing from pursuing police officers. (§ 2800.2, subd. (a).)  The People further alleged defendant suffered two prior convictions for serious or violent felonies, "strikes" within the meaning of Penal Code sections 667, subdivisions (b)-(j) and 1170.12, subdivisions (a)-(d).  Defendant pleaded not guilty and denied the allegations.  The priors may have been too old to affect his sentence in this case.  (See Pen. Code, § 667.5, subd. (a).

Defendant proceeded to jury trial in August 2014.  The jury found him guilty of the sole charged count.  In a bifurcated proceeding, the trial court found true both strike prior allegations.  The court denied defendant's motion under *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497 to strike the strikes.  The court sentenced defendant to four years in prison, calculated by doubling the midterm sentence of two years. Defendant timely appealed.

## FACTUAL BACKGROUND

On April 12, 2014, at approximately 2:53 a.m., California Highway Patrol (C.H.P.) officers William Tenborg and James Final were sitting in their patrol vehicle on the Paramount Boulevard on-ramp to the eastbound 105 freeway.  The patrol car was a

---

[1] All further statutory references are to the Vehicle Code unless otherwise specified.

"marked black and white C.H.P. vehicle with overhead lights" and was equipped with a front-facing camera that automatically activates when the overhead lights are turned on. Officer Tenborg was seated in the driver's seat, and Officer Final was in the front passenger seat. Officer Tenborg was wearing his tan C.H.P. uniform.

Both officers heard the "loud exhaust" or "humming" noise of a motorcycle. Officer Tenborg looked in his side mirror and saw the headlight of a motorcycle approaching at high speed. The motorcycle accelerated rapidly past the patrol car. As it passed, Officer Tenborg noted that it was a black motorcycle driven by an individual wearing dark clothes, black shoes, white socks, and a blue helmet.

Officer Tenborg accelerated onto the 105 freeway and began following the motorcycle. The patrol car came within about 40 feet of the motorcycle, but the officers were unable to see the motorcycle's low-mounted license plate. Officer Tenborg "paced" the motorcycle and concluded it was traveling 90 miles per hour despite the speed limit of 65 miles per hour.

The driver of the motorcycle, later identified as defendant, turned his head to the left and looked over his shoulder. The motorcycle then "rapidly accelerated" and moved all the way from the far-right lane into the carpool lane, in the process crossing the double-yellow line separating the carpool lane from the other lanes. While defendant was accelerating across the freeway, the rear tail light of the motorcycle turned off. Officer Tenborg activated the patrol car's overhead lights and followed defendant; the officers were still able to see the motorcycle's headlight. Defendant's motorcycle was the only one either officer saw that night.

Officer Tenborg accelerated to the patrol car's maximum speed of 130 miles per hour in an attempt to keep up with defendant. Defendant occasionally slowed such that the patrol car could keep pace, then accelerated to pull away. He moved "like a snake in and out of all lanes," making unsafe lane changes and crossing over the double yellow carpool lane line. Officer Tenborg turned the overhead lights off when the patrol car was not directly behind defendant to avoid scaring other drivers, who may "freak . . . out" and

3

make unpredictable lane changes when they see patrol cars approaching on the freeway, and to encourage defendant to slow down.

Defendant "transitioned" from the eastbound 105 freeway to the northbound 605 freeway. Officer Tenborg briefly lost sight of defendant as he went up and over the "ascending banking, left transition road," but Officer Final was able to look over to the left and keep the motorcycle in his sight. The tail light of the motorcycle also was back on, which allowed Officer Final to see the motorcycle merge across the 605 and into the carpool lane.

Around the time defendant entered the 605 freeway, Los Angeles County Sheriff's Department tactical flight deputy Russell Helbing joined the chase in his helicopter. Using the helicopter's infrared camera, Officer Helbing saw a motorcycle driving northbound in one of the inner lanes of the 605 freeway. Officer Helbing knew the motorcycle was the one he had heard about on the radio because "[i]t was traveling at a high rate of speed" and "passing other vehicles like they were standing still." Officer Helbing estimated the motorcycle was traveling over 100 miles per hour. Officer Helbing shined the helicopter's "50 million candle watt spotlight" on the motorcycle, the only one he saw on the 605 freeway. Officers Tenborg and Final saw the helicopter illuminating the motorcycle. Officer Tenborg activated the patrol car's overhead lights at some point on the 605 freeway and kept them on.

Defendant made "a hard right swerve toward the far right lane, at which time he took the Telegraph exit-only lane." Defendant passed the eastbound exit, which "charts off to the right to access Telegraph eastbound," and took the westbound off-ramp, a "cloverleaf-style" circle that "wraps underneath the freeway." Officer Final advised Officer Tenborg to take the eastbound off-ramp so they could attempt to cut off defendant on Telegraph Road. Officer Tenborg took the eastbound off-ramp. When he reached the bottom of the ramp, he did a U-turn and parked near the end of the westbound off-ramp.

Defendant was stopped at a stop sign at the bottom of the westbound off-ramp. He and his motorcycle were still illuminated by the helicopter, and both Officers Tenborg

4

and Final recognized the motorcycle and defendant's blue helmet as those they initially saw at the start of the three-to-four minute chase. Officers Tenborg and Final took defendant into custody, at which point defendant told Officer Tenborg he lived down the street but "didn't know where he was" because he had dyslexia. He also told Officer Tenborg he stopped when he saw the patrol car at the bottom of the off-ramp and "he had no reason to run" because he had been pulled over multiple times and advised to fix the mounting of his license plate. Officers Tenborg and Final examined defendant's motorcycle and discovered that it had an aftermarket "kill switch" near the handlebars that turned the tail light off and on. Defendant told Officer Tenborg he did not know what the switch did.

The People showed the jury the video of the incident recorded by the patrol car's camera. The accompanying audio recording was not offered or admitted into evidence.

## DISCUSSION

Defendant argues the court prejudicially erred by delivering the pinpoint instruction the People prepared and requested. He contends the instruction was inaccurate and "impermissibly favored the prosecution." The People dispute these contentions, which they further contend are waived or forfeited due to defendant's failure to object to the instruction at trial. We address defendant's contentions on the merits and find them unpersuasive.

## I.     Relevant Procedural Background

Prior to the close of the People's case-in-chief, the prosecutor advised the court that she "may want to make a jury instruction that tailors to a case," *People v. Copass* (2009) 180 Cal.App.4th 37 (*Copass*). The court told the prosecutor she would have to "fashion" the instruction herself and share it with defense counsel. The prosecutor complied with the court's directives.

Later, after both sides rested, the parties discussed jury instructions with the court. Much of the discussion took place off the record, but the prosecutor asked the court on the record about its "inclination" on the proposed *Copass* instruction, which read, "The

5

statute defining the offense of flight from a pursuing peace officer does not require that the pursuing officer continuously activate the emergency lights and siren where there is but one pursuit." The court stated it had read *Copass* and asked defense counsel if he wanted to be heard. Defense counsel responded, "I'll submit." The court then stated that the proposed instruction "is, in fact, a correct statement of the law, as per People versus Copass." The court then recessed to give the parties an opportunity to look through the instructions packet.

After the recess, the court and parties further discussed the jury instructions. During that discussion, the court listed the CALCRIM instructions it planned to give and advised the parties it was going to deliver the *Copass* instruction as well. The court reiterated that it "had an opportunity to read People versus Copass" and stated, "[i]t is Shepardized. It is good law, a correct statement of the law consistent with the court's practice." The court asked the parties if there was "anything either side wants to put on the record before we bring the jury out." Defense counsel responded, "No, your honor." The court then instructed the jury. At the conclusion of the instructions, which included the *Copass* instruction, the court asked counsel outside the presence of the jury if there was anything they wanted to put on the record. Defense counsel did not respond.

During closing argument, the prosecutor argued that defendant led the C.H.P. officers "on a short, very direct, and very fast pursuit." He highlighted defendant's use of the tail light "kill switch," his look over his shoulder, and the four traffic offenses he allegedly committed (driving in excess of the posted speed limit, driving in excess of 100 miles per hour, making unsafe lane changes, and crossing a double yellow line). The prosecutor also mentioned that none of the witnesses saw any other motorcycles on the freeways that evening, and argued that defendant's statements to Officer Tenborg were "preposterous." The prosecutor mentioned the patrol car's overhead lights twice: once to remind the jury that the lights could be seen on the video, and a second time as part of a checklist of the elements of the charged offense.

6

Defendant primarily challenged the credibility of the People's witnesses during his closing argument. Defendant also posited a theory of mistaken identity, arguing that he would not have stopped at the bottom of the Telegraph Road off-ramp and cooperated with the C.H.P. officers if he had been the motorcyclist trying to evade them. Defendant asked, "If indeed he had been the evader, why would he wait at that exit? He could have doubled back and taken the southbound 605. He could have started a whole new pursuit that made it more difficult for the police officers, but no." Defendant mentioned the patrol car's overhead lights only once, asking rhetorically, "And why did they not activate their lights" when the motorcyclist initially passed them and gave them probable cause to stop him because his license plate was not visible.

## II. Analysis

### A. Defendant's arguments are preserved.

The People contend defendant affirmatively waived his right to challenge the *Copass* instruction by declining the trial court's repeated invitations to do so. Alternatively, they contend the related but distinct doctrine of forfeiture bars his claim that the instruction was argumentative. We reject these contentions.

The doctrines of waiver and forfeiture are distinct. Forfeiture is the failure to timely assert a right, while waiver is the "'intentional relinquishment or abandonment of a known right.' [Citations.]" (*United States v. Olano* (1993) 507 U.S. 725, 733; *People v. Simon* (2001) 25 Cal.4th 1082, 1097, fn. 9.) "The loss of the right to challenge a ruling because of a failure to object has often been referred to as a 'waiver,' but it is more accurately deemed a 'forfeiture,' because it is an unintentional relinquishment." (6 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Reversible Error, § 41, p. 572.) The situation here is unusual in that the court expressly asked defendant if he wanted to be heard regarding *Copass* and the pinpoint instruction, to which he responded, "I'll submit." The People have not directed us to any case law holding that such a response effects a waiver, however.

7

The general rule is that a party may not complain on appeal about a given instruction that was correct in law and responsive to the evidence unless the party made an appropriate objection. (*People v. Hudson* (2006) 38 Cal.4th 1002, 1011-1012.) But we may review any instruction that affects the defendant's "substantial rights," with or without a trial objection. (Pen. Code, § 1259.) "Ascertaining whether claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim—at least to the extent of ascertaining whether the asserted error would result in prejudice if error it was." (*People v. Andersen* (1994) 26 Cal.App.4th 1241, 1249.) In any event, defendant's position is that the challenged instruction was legally incorrect, and, moreover, lessened the prosecution's burden by highlighting factual inferences in its favor. Thus, defendant did not have to raise his arguments at trial to preserve them for appeal. (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1087.) We therefore review defendant's claims on the merits.

### B.     The instruction was correct in law.

Defendant concedes the instruction "was an accurate statement of what the Court of Appeal said in *Copass*," but argues "it was not an accurate statement of what Vehicle Code section 2800.2 requires." He contends that section 2800.2 is silent as to whether a patrol vehicle's lights and siren need to be on for the entire duration of a chase and as to whether a chase remains a single pursuit even when visual contact with the target is lost. Therefore, defendant argues, the instruction as given was not a correct statement of law. We review the issue de novo (*People v. Posey* (2004) 32 Cal.4th 193, 218) and conclude the instruction was correct.

Section 2800.2, subdivision (a) provides, in pertinent part, "If a person flees or attempts to elude a pursuing peace officer in violation of Section 2800.1 and the pursued vehicle is driven in a willful or wanton disregard for the safety of persons or property, the person driving the vehicle, upon conviction, shall be punished by imprisonment in the state prison . . . ." Subdivision (b) clarifies that "a willful or wanton disregard for the safety of persons or property includes, but is not limited to, driving while fleeing or

8

attempting to elude a pursuing peace officer during which time either three or more traffic violations that are assigned a traffic violation point count under Section 12810 occur, or damage to property occurs." (§ 2800.2, subd. (b).)

Section 2800.2 "incorporates and expressly requires a violation of section 2800.1." (*Copass*, *supra*, 180 Cal.App.4th at p. 41.) For a violation of section 2800.1 to occur, "all of the following conditions" must exist: "(1) The peace officer's motor vehicle is exhibiting at least one red lamp visible from the front and the person either sees or reasonably should have seen the lamp. [¶] (2) The peace officer's motor vehicle is sounding a siren as may be reasonably necessary. [¶] (3) The peace officer's motor vehicle is distinctively marked. [¶] (4) The peace officer's motor vehicle is operated by a peace officer . . . and that peace officer is wearing a distinctive uniform." (§ 2800.1, subd. (a)). Accordingly, by its incorporation of section 2800.1, section 2800.2 requires the prosecution to prove that the patrol vehicle pursuing the defendant "is exhibiting at least one red lamp visible from the front" and that the defendant "either sees or reasonably should have seen the lamp." Defendant is correct that the statute itself sheds no light on the definition of a pursuit or whether the patrol vehicle must display its red lamp throughout the duration of a pursuit.

*Copass*, a case virtually indistinguishable from this one on its facts, interpreted the statute and its requirements, however. In *Copass*, a C.H.P. officer patrolling in an aircraft observed a motorcycle traveling "at high speed." (*Copass*, *supra*, 180 Cal.App.4th at p. 39.) The airborne officer alerted a second officer patrolling the roadway that the motorcycle was approaching. (*Ibid.*) After using his radar gun to clock the motorcycle at 91 miles per hour, the officer on the roadway attempted to effect a traffic stop. (*Ibid.*) The motorcyclist nodded, slowed, and drove to the shoulder, but then "'just took off . . . at rapid acceleration,'" without signaling, before the officer completed his walk toward the motorcycle. (*Ibid.*) The officer returned to his patrol car, activated the vehicle's overhead lights, and pursued the motorcycle at speeds exceeding 100 miles per hour. (*Ibid.*)

9

The officer lost sight of the motorcycle and turned off the patrol car's overhead lights while he drove through side roads looking for the motorcycle. (*Copass*, *supra*, 180 Cal.App.4th at p. 39.) Like the officers in this case, the officer testified that he turned his overhead lights off because "police emergency lights sometimes endanger other motorists because the lights cause 'panic stopping.'" (*Ibid.*) After a few minutes, the airborne officer spotted the motorcycle and alerted the officer on the roadway. The officer on the roadway did not reactivate his overhead lights, however, because he did not want to alert the driver, defendant Copass, that he was nearby. (*Id.* at pp. 39-40.) Copass "suddenly turned right onto the highway," prompting another driver to swerve and the officer to reactivate the patrol car's overhead lights. (*Id.* at p. 40.) All the while, the officer in the plane was watching Copass, and saw him cross a double-yellow line. Eventually, the officer in the patrol car was able to turn in front of Copass, block his path, and arrest him. (*Ibid.*) A jury found Copass guilty of violating section 2800.2. (*Ibid.*)

On appeal, Copass argued that the prosecution failed to establish the requisite violation of section 2800.1 because the officer did not have his emergency lights on and was not pursuing Copass when Copass committed one of the traffic violations required under section 2800.2, subdivision (b). (*Copass*, *supra*, 180 Cal.App.4th at p. 40.) The court rejected this contention. It reasoned that although the officer on the roadway "turned off his emergency lights for the five minutes that he lost sight of Copass, there was but one pursuit. At the inception of the pursuit, [the officer] activated his emergency lights. He reactivated the lights after he saw Copass stopped at the stop sign before turning onto the highway. . . . It is a reasonable inference that Copass was aware of the pursuit because initially he suddenly drove from the shoulder as [the officer] approached, drove at high speed along a side road to the highway, and turned into traffic forcing an oncoming vehicle into a left turn lane. Thus Copass received notice of the pursuit and the purpose of the statute is satisfied." (*Id.* at p. 41.)

The contested instruction in this case—"The statute defining the offense of flight from a pursuing peace officer does not require that the pursuing officer continuously

10

activate the emergency lights and siren where there is but one pursuit"—plainly incorporates the sound reasoning and holding of *Copass*. Again, defendant concedes that point. He claims *Copass* is distinguishable, however, because "the *Copass* court was evaluating an argument that there was insufficient evidence of guilt because the police officer's lights were not on when one of the predicate vehicle code violations occurred. A holding that there *can* be sufficient evidence of guilt in a case where the lights and sirens are not on the entire time of the chase is not the same thing as telling the jury that the statute does not require the lights and siren to remain on when it is one pursuit." We fail to see the distinction.

Section 2800.2, by incorporating 2800.1, requires the jury to find that "[t]he peace officer's motor vehicle is exhibiting at least one red lamp visible from the front and the person either sees or reasonably should have seen the lamp." It is silent as to when or for what duration the red lamp must be exhibited. But where there are gaps in statutes, it is the role of the courts to interpret and construe statutes enacted by the Legislature. (*People v. Mendoza* (2015) 241 Cal.App.4th 764, 790.) The *Copass* court did so, clarifying that the statutory language "is exhibiting at least one red lamp" does not mean that the patrol car must have its lights on for the entirety of the chase. In other words, *Copass* held that the jury may conclude section 2800.2 was violated even where the evidence shows that a patrol car's lights were not on during every moment of a pursuit. This is tantamount to a holding that the statute does not require continuous illumination of overhead patrol car lights in order to satisfy the purpose of the statute. The pinpoint instruction accordingly was correct.

### C. The instruction was not argumentative.

Defendant also contends that the instruction was argumentative because it drew inferences favorable to the prosecution and instructed the jury on what conclusion to draw from the evidence. We review this contention de novo. (*People v. Posey*, *supra*, 32 Cal.4th at p. 218.)

11

"An instruction is argumentative when it recites facts drawn from the evidence in such a manner as to constitute argument to the jury in the guise of a statement of law. [Citation.] 'A jury instruction is [also] argumentative when it is "'of such character as to invite the jury to draw inferences favorable to one of the parties from specified items of evidence.' [Citations.]"' [Citation.]" (*People v. Campos* (2007) 156 Cal.App.4th 1228, 1244.) In contrast, a proper instruction sets forth a principle of law applicable to the case, in plain language, and indicates no opinion as to any fact in issue. (*People v. Wright* (1988) 45 Cal.3d 1126, 1135.) Thus, in a proper instruction, "'[w]hat is pinpointed is not specific evidence as such, but the *theory* of the . . . case.' [Citation.]" (*Id.* at p. 1137.)

Here, the instruction stated, in plain language, that the law "does not require that the pursuing officer continuously activate the emergency lights and siren where there is but one pursuit." That is a principle of law applicable to the case, derived from *Copass*'s interpretation of sections 2800.1 and 2800.2. Defendant claims the instruction "impliedly asserted that (i) only one pursuit was involved in this case and (ii) it didn't factually matter whether the police had their lights on during that entire pursuit." We do not read the instruction that way. It used neutral language and did not indicate that the jury should find that Officer Tenborg continuously activated the lights or that there was a single pursuit. Instead, it informed the jury that if it were to conclude that there was one pursuit, the statute did not require the patrol car's emergency lights to be activated continuously. This is not argumentative, particularly where neither party's argument focused on the "emergency lights" element of the crime.[2]

---

[2] Because we conclude that no error occurred, we need not consider defendant's alternative argument that "counsel was ineffective to the extent that reversible error occurred." Indeed, defendant recognizes that if we find "no error, then counsel could not have been ineffective for failing to object to a legally accurate instruction."

12

**DISPOSITION**

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

COLLINS, J.

We concur:

EPSTEIN, P. J.

WILLHITE, J.