Filed 1/12/15  P. v. Snow CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(El Dorado)

----

| | |
|---|---|
| THE PEOPLE, | C073467 |
| Plaintiff and Respondent, | (Super. Ct. No. P09CRF0512) |
| v. | |
| BRUCE WILLIAM SNOW, | |
| Defendant and Appellant. | |

Defendant Bruce William Snow and his wife Kathy Snow became Jane Doe's foster parents when she was seven years old.[1]  The couple adopted Jane at the age of nine.  When Jane turned 11 years old, defendant began molesting her.  After Jane confided in a teacher, an investigation began, culminating in an information charging defendant with continuous sexual abuse of a child.  (Pen. Code, § 288.5.)[2]  A jury found

---

[1] The victim in this case is referred to as Jane Doe in the charging document and as CW01 in the reporter's transcript.  We will refer to her herein as Jane Doe.

[2] All further statutory references are to the Penal Code unless otherwise designated.

1

defendant guilty, and the trial court sentenced him to 12 years in state prison. Defendant appeals, contending (1) the court abused its discretion in denying his *Marsden* motion, (2) we should independently review the dependency court records, (3) instructional error, and (4) the court erred in ordering defendant to pay the cost of the probation officer's presentence report. We shall affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

An information charged defendant with continuous sexual abuse of a child and alleged that he engaged in three or more acts of substantial sexual conduct within the meaning of section 1203.066, subdivision (b). The following evidence was introduced during the jury trial.

**Jane Doe's Allegations**

When Jane Doe was seven she went to live with defendant and his wife Kathy Snow as their foster child. Defendant and Kathy adopted Jane when she was nine. The couple had adopted another daughter, CW02, who was two and a half years younger than Jane, and they had two biological sons, CW03 and CW04, who were older than Jane.[3] The jury heard a stipulation that one of defendant's biological sons had raped Jane on numerous occasions.

One evening when Jane was 11 years old, Kathy and her two sons went to a concert, leaving Jane and her sister at home with defendant. Afraid to sleep in her own room, Jane slept in the living room with CW02. Defendant set up an air mattress for Jane. After Jane lay down on the air mattress, defendant lay on top of her. He told Jane he would get off of her when she stopped struggling. When CW02 came into the room, Jane stopped struggling and defendant got up.

---

[3] The reporter's transcript refers to Jane's sister and two brothers as CW02, CW03, and CW04, respectively, and we will do the same.

2

Also when Jane was 11, defendant began forcing her to sit on his lap. Jane initially testified that she willingly sat on his lap, but later she testified that she only sat on his lap when she knew he would not let her go. When she sat on defendant's lap, she could feel his penis pressing against her.

During one incident, Jane came inside after an argument with Kathy. Defendant pulled her onto his lap and massaged her back. Jane felt his erect penis move up and down against her rear end. She tried to get up, but defendant pulled her back down onto his lap.

On another occasion, Jane got up off defendant's lap and noticed he had a wet spot on the crotch of his pants. Jane also testified as to an incident during which she and CW02 were having a pillow fight. Defendant had Jane sit on his lap, facing him. Jane fell backwards as she struggled to get off. On direct examination, Jane testified defendant had her sit on his lap seven times. During cross-examination, Jane testified it was about 30 times. When asked about the discrepancy, Jane explained she was scared.

Jane also testified that on other occasions defendant would back her against a wall and then press his body against hers. During these incidents, Jane could feel defendant's penis pressed against her stomach. This occurred four times. Jane later testified it happened 25 times. When asked about the discrepancy, Jane again stated she was afraid.

Jane testified that on one occasion, Jane, CW02, and CW03 got into an argument over the television. Defendant told Jane to go to her room, pushed her into the bedroom, and she fell. He lay on top of Jane when she tried to get up. She bit defendant and he hit her in the face.

Jane also recounted an incident in which, while she was lying on the floor, defendant started poking her with a broomstick. Defendant poked Jane in the stomach, grinned, and then touched her vagina with the broomstick.

3

**Subsequent Investigation**

After Jane told her teacher, Gail Buhlert, about defendant's actions, Buhlert contacted Kathy. Buhlert told Kathy she would report defendant's conduct if Kathy did not. Kathy contacted law enforcement. However, twice Kathy told Jane to "tell some stuff but not everything."

Jane participated in an interview at the multidisciplinary interview center, and the jury heard a recording of the proceeding. During the interview, Jane discussed the incidents she testified to at trial. She estimated she sat on defendant's lap when he had an erect penis about 30 times, and he pressed her against the wall around 25 times. Defendant's penis was erect about 10 out of the 25 times.

During the interview, Jane stated she did not tell Kathy about the incidents because she "thought it was [her] fault and [she] thought it was normal." When Kathy asked her if defendant had done anything to her, Jane told her "part of it." Jane asked CW02 if defendant had done anything to her and CW02 answered no.

One of defendant's neighbors, Linda Lange, testified that in October or November of 2009 defendant told her he had touched Jane "inappropriately." Defendant also told Lange what he had done was not right. When Lange asked him about the incident, defendant said "he had not done the deed."

Detective Kenneth Barber contacted Kathy concerning Jane's allegations. In November 2009 Barber asked Kathy to place a pretext phone call to defendant. The jury heard the subsequent phone call.

During his conversation with Kathy, defendant stated his relationship with Jane "wasn't the healthiest thing." Defendant told his wife, "My heart was not in a great place. But I didn't pursue some kind of sexual relationship with her ever." According to defendant, he sat on Jane's lap three or four times to try to get her to leave him alone; Jane sat on his knees but did not sit on his lap. Defendant admitted getting an erection one time when Jane sat on his knees.

4

Defendant also admitted he had "lustful" thoughts about Jane but said he had rejected those thoughts. He denied he ever had a "wet spot" on his pants after Jane sat in his lap. Nor did he ever press Jane against a wall. Defendant told Kathy he was not trying to "put this on" Jane, but Jane "has a seductive side to her."

A few weeks later, Detective Barber spoke with defendant over the telephone; the recording was played for the jury. Defendant again stated he sat on Jane's lap; she did not sit on his lap. However, defendant stated that on one occasion Jane did sit on his lap, and he had an erection. Defendant denied ever touching Jane inappropriately. When Barber asked defendant why he would get an erection with a 13-year-old girl on his lap, defendant explained he was easily stimulated.

Although defendant admitted having sexual thoughts about Jane, he rejected those thoughts. According to defendant, Jane asked him to put lotion on her back, and he initially refused to do so before he "succumbed to her request." Defendant told Barber he had always had a problem with "lustful temptation," but he rejected it. Defendant stated, "maybe it's happened and I pushed it out [of] my memory," but he did not remember pressing his body against Jane. He denied ejaculating when Jane sat on his lap.

**Defense**

### CW02's Testimony

CW02 began living with defendant and Kathy at the age of two; she was 14 years old at the time of trial. CW02 recalled a time when Kathy and her two sons went to a concert. CW02 believed they were gone for a month. She did not remember defendant holding Jane down on a mattress. Instead, CW02 testified, Jane sat on defendant's lap for a good night hug.

The only time CW02 observed defendant restraining Jane was when she "went crazy." CW02 never saw anything take place between Jane and defendant that made CW02 uncomfortable. CW02 left defendant's household when she was 11; she did not want to remember her time with defendant and his family.

5

### Defendant's Testimony

Defendant testified on his own behalf. Defendant remembered Kathy taking their sons to a concert for two days. That night, Jane set up a mattress in the living room. He did not hold Jane down on the mattress. He was only joking when he said that he would sleep on the mattress with Jane. Jane did not sit on his lap facing him.

Defendant testified that although Jane would sit on his knee, he never had her sit in his lap for sexual purposes. Defendant also testified about an incident when Jane became angry with him, screamed at him, and hit him.

Defendant denied poking Jane in her vagina with a broomstick. Instead, defendant testified he "whacked her in the leg" with the broomstick. Although defendant might have pushed Jane against the wall one time to discipline her, he did not have an erection at the time. He had a vague memory of getting an erection when Jane sat on his knee.

Defendant admitted having "lustful thoughts" for Jane, beginning when she was 11 years old. Defendant found these thoughts "abhorrent" and cast them from his mind. He also testified that at times he believed Jane was trying to seduce him.

### Fontana Interview

In October 2009 Deputy R. Fontana responded to a dispatch call and spoke with Jane and Kathy. Fontana's interview with Jane was played for the jury. Jane recounted the incident with the mattress in the living room. She stated she lay down on the mattress, and defendant sat on her stomach and told her he was going to sleep on the mattress with her. Jane tried to get defendant off of her, but he held her down. Jane told Fontana that defendant would press her back against a wall and press his body against her. At the beginning, defendant pressed her against the wall about once a month, but then he increased it to once a week.

Jane also told Fontana that defendant forced her to sit on his lap. She could feel defendant's penis against her rear end. Once, defendant had a wet spot on his sweatpants when Jane got up from his lap. Jane also recalled the incident in which she and CW02

had a pillow fight.  Defendant made Jane sit on his lap facing him.  He did not have an erection during this incident.  In addition, Jane described the incident in which defendant pushed her into the bedroom.  He tackled her because she was trying to hit him.  Jane bit defendant and he hit her in the face.

## *Kathy Snow's Testimony*

In October 2009 Kathy called the sheriff's department.  She never saw defendant do anything inappropriate with Jane.  Kathy called the authorities because Jane told her what defendant had done, not because Gail Buhlert threatened to do so first.  Nor did Kathy pressure Jane to change her story.  Kathy did not believe she could trust Jane "all the time."

## Rebuttal

Gail Buhlert, one of Jane's elementary school teachers, testified.  Jane called Buhlert at home and told her she was scared.  The impression Buhlert got from the phone conversation was that defendant was having sex with Jane.  Buhlert called Kathy, who said she would report the abuse within 24 hours.

## DISCUSSION

### Denial of Defendant's *Marsden* Motion

Defendant argues the trial court abused its discretion in denying his *Marsden* motion.[4]  According to defendant, the relationship between him and defense counsel had totally broken down to the point that his right to a fair trial was violated.

Clearly, defendant and his counsel did not form a close bond over the course of counsel's representation; they did not end the experience as best friends, or friends at all.  However, mutual admiration is not an essential element of an acceptable attorney-client relationship.  The point of *Marsden* and its progeny is that a defendant is entitled to

---

[4]  *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

7

adequate representation. If the defendant and the attorney have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result, then substitute counsel must be appointed. (*People v. Clark* (2011) 52 Cal.4th 856, 912 (*Clark*).) Here, despite counsel's scathing assessment of his client's character and conduct, in the trial court's estimation the attorney provided excellent representation to defendant. Whatever the disagreements between them, no matter how profound, they did not compromise the attorney's professionalism or defendant's right to assistance of counsel.

**Background**

Defendant filed a written *Marsden* motion, consisting of a preprinted form on which he checked off several boxes indicating why he believed trial counsel had provided inadequate representation. Defendant hand wrote the following: "In 3 years counsel has visited me 2 [times] in jail; once to give me discovery; the 2nd time to discuss the deal offered by the D.A. Counsel has not discussed his plan for my defense or inquired of my imput [*sic*] for my defense. Counsel was told to order a motion to [Sacramento County] for records & failed to do so. Counsel has stated he wants to put off my trial until next June; this is what he has done in the past."

The trial court held a closed *Marsden* hearing in November 2012. The court asked defense counsel if he would be ready for trial on January 22, 2013. Defense counsel responded that he needed more time to investigate defendant's case and that he was also representing another defendant in a special circumstance murder case set for March 5, 2013. Defense counsel told the court, "I would prioritize the special circumstance case over Mr. Snow's case. Let there be no bones about it, and I would prefer to spend my time working on that case."

The trial court then told defendant: "I would tell you this, Mr. Snow: I'm familiar with [defense counsel]. I know that he is a competent lawyer. I know that he will do what he needs to do in order to prepare your case for trial.

"I note that your concerns, as identified here, that he hasn't conferred with you regarding preparation of the Defense -- [defense counsel], how many times have you met with [defendant]?" Defense counsel responded, "I don't know for sure. I know he says two. I know it's been more than two, but it's probably no more than five." The court asked when defense counsel had last met with defendant. Defense counsel stated, "Oh, heavens. I would say four to six months ago. And the reason why I met with him then was to convey with him what I thought was an extremely reasonable offer of credit for time served."

Defense counsel indicated he understood defendant's defense was that Jane was crazy. He spent about 30 hours working on a portion of defendant's defense. Jail visits, defense counsel asserted, were of little use. In addition, defense counsel pointed out that defendant owned a home and had been able to hire a private attorney to represent his wife. Based on this, defense counsel did not believe defendant was eligible to receive free legal services. Defense counsel told the court: "So I'm stuck here on a flat conflict rate. I have done more work than most privately retained attorneys do. Most privately retained attorneys would charge [$]30,000."

Defense counsel outlined the problems he had with defendant: "I'm glad that [defendant] brought this motion, because I was thinking of bringing my own motion, because I find it very difficult to represent him because I think he cheats. I think he's a chiseler in terms of money. I think he's abusing the system.

"I've done the work I have to do to be confident. I think it would be in his best interests to get another attorney. I believe there's an irreparable breakdown in our relationship. I have no desire to go out to the jail to see him. He's going to tell me the same old stuff he's already told me in his letters and in our previous visits. That's where I'm coming from.

"I will tell you this: In addition, I have obtained investigative services on three separate occasions, only one of particular merit. We went out to investigate some of the allegations set forth in some [of defendant's] letters. They came back empty.

"I mean, there's only so much -- I understand that you're entitled to effective assistance of counsel but, on the other hand, you can't abuse the system. . . . I mean, you just can't abuse the system. You can only get so much for nothing, Judge. That's where we are. And if the Appellate Court has a problem with me, they have a problem for [*sic*] me.

"But I will say for the record that I have thoroughly investigated this case. I know where he's at. I think his decision not to enter the plea bargain is ill-advised, and I'm being polite. I think it's best he get another lawyer."

In response, defendant said he did not believe defense counsel was providing adequate representation because of a lack of communication and defense counsel's failure to conduct an adequate investigation. He complained that he and defense counsel had never had an extensive discussion about his case, and he felt defense counsel was making his other cases a priority over defendant's.

The trial court expressed frustration over the lengthy delays and requested that defense counsel make defendant's case a priority. The court also suggested that defense counsel meet with defendant as defendant requested. Defense counsel responded: "Judge, any meeting with him is not going to be productive. I'm going to tell that right -- Judge, I'm sorry. I have formed an opinion about this man that -- I don't want to hear from him. I don't want to talk to him. I don't want to speak to him."

Defendant announced he needed to "fire" defense counsel. The trial court responded that it was not going to replace defense counsel and ordered counsel to meet with defendant. This colloquy followed:

"[Defense Counsel]: Judge, here's the problem: I'm a pretty easygoing guy, and you know that. You've seen me practice law for 30 years. We've practiced law together.

10

And there's some -- [defendant] is correct. If I go see him, all I'm going to do is yell at him. I'm telling you that. I'm just going to yell at him. And if you want me to do that, that's fine. I will do that.

"The Court: [Defense counsel], I don't expect you to yell at him. I expect you to go over there and to proceed in a professional manner to do what is necessary and to abide by your professional responsibilities --

"[Defense Counsel]: I understand.

"The Court: -- no matter what you think of [defendant].

"[Defense Counsel]: Judge, you know than I'm a professional. I behave professionally. I've represented other people that I can't stand, but I'm telling you he's at the apex of the list.

"The Court: Okay.

"[Defense Counsel]: That's all I'm saying.

"The Court: I expect you to do what your professional duties require you to do, [defense counsel].

"[Defense Counsel]: Yes, sir."

**Discussion**

Defendant labels the trial court's denial of his *Marsden* motion an abuse of discretion. According to defendant, he and defense counsel had become embroiled in an irreconcilable conflict requiring substitute counsel.

If a defendant requests substitute counsel, the trial court is obligated to give the defendant an opportunity to state any grounds for dissatisfaction with current appointed counsel. In turn, if the defendant establishes that his or her right to counsel has been "substantially impaired," substitute counsel must be appointed. (*People v. Sanchez* (2011) 53 Cal.4th 80, 90.) Substantial impairment can be established in two ways: when the attorney is providing constitutionally substandard representation, or when the

11

defendant and defense counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result.  (*Clark*, *supra*, 52 Cal.4th at p. 912.)

Appointment of new counsel is appropriate in the face of an irreconcilable conflict between a defendant and defense counsel because such conflict is fatal to an effective attorney-client relationship.  (*People v. Ortiz* (1990) 51 Cal.3d 975, 984.)  In determining whether such a destructive conflict exists, we consider the degree of hostility and the impact such hostility has on communication between the defendant and defense counsel.  (*Hudson v. Rushen* (9th Cir. 1982) 686 F.2d 826, 832; *People v. Daniels* (1991) 52 Cal.3d 815, 843.)

We review the denial of defendant's *Marsden* motion for an abuse of discretion.  We do not reverse unless the defendant has shown the trial court's failure to replace counsel substantially impaired the defendant's right to assistance of counsel.  (*People v. Taylor* (2010) 48 Cal.4th 574, 599.)

Defendant argues just such an abuse of discretion occurred in his case.  Defendant states:  "By [defense] counsel's own admission, his relationship with [defendant] had become irreparably broken.  He personally disliked, if not hated, [defendant] and it impacted his professional relationship with [defendant].  Counsel admitted that he would not be able to meet with [defendant] and have a rational discussion about the case.  According to counsel, any attempt at a productive meeting would devolve into a session of yelling at [defendant]."

We acknowledge the testimony by both defense counsel and defendant at the *Marsden* hearing reflected a schism between the two.  Defense counsel found defendant difficult to represent and described him as a chiseler who abused the system.  Counsel also stated, "I believe there's an irreparable breakdown in our relationship" and expressed no desire to visit him in jail.  If defense counsel did meet with defendant, "all I'm going to do is yell at him."  Finally, defense counsel put defendant at the apex of the list of people he had represented whom he could not stand.

12

We find these comments problematic and indicative of defense counsel's frustration with his client. However, defense counsel also testified he had met with defendant, obtained investigative services, and "thoroughly investigated this case." Defense counsel also assured the court he would do what his professional duties required.

The People argue such animosity does not require substitution of counsel, citing *People v. Smith* (1993) 6 Cal.4th 684 (*Smith*). In *Smith*, the defendant sought to withdraw a guilty plea, arguing defense counsel performed ineffectively. At a *Marsden* hearing defense counsel admitted arguing with the defendant, becoming " 'a little irritated' " with him, and using foul language when he became " 'fed up' " with the defendant's accusations of inadequate representation. (*Id*. at p. 688.) The Supreme Court upheld the trial court's denial of the defendant's *Marsden* motion. The court concluded: "Although clearly some heated words were spoken between client and attorney during the events preceding the guilty plea, that alone does not require a substitution of counsel absent an irreconcilable conflict." (*Id*. at p. 696.)

Defendant argues his situation differs from that in *Smith*, since in his case an irreconcilable conflict did exist. However, defendant's argument rests on the words spoken during the *Marsden* hearing by defense counsel, words the trial court heard and evaluated. We have access only to the printed transcript and cannot truly assess the impact of defense counsel's statements. In assessing the trial court's decision, we apply the deferential abuse of discretion standard. (*People v. Jones* (2003) 29 Cal.4th 1229, 1245 (*Jones*).)

We reiterate that, despite defense counsel's dislike of defendant, defense counsel stated he had reviewed the discovery in defendant's case, read the letters defendant had written him, and spent hours litigating defendant's defense. He assured the court he had thoroughly investigated the case and would perform the professional duties required of him.

13

Defendant was given an adequate opportunity prior to the court's ruling on his motion to explain his dissatisfaction with trial counsel. To the extent there was a credibility question between counsel and defendant at the hearing, the trial court was entitled to accept counsel's testimony. (*Jones*, *supra*, 29 Cal.4th at pp. 1245-1246.) In *Jones*, the defendant stated the grounds for requesting substitute counsel: (1) the defendant and counsel were not " 'getting along' "; (2) counsel did not visit the defendant prior to an earlier hearing; (3) counsel did not do everything on the " 'long list' " of tasks the defendant assigned him; and (4) counsel believed the defendant guilty, as evidenced by his discussion of a possible plea bargain. Counsel addressed each of the defendant's complaints: (1) although the defendant and counsel had disagreements, counsel saw " 'no reason' " why he could not continue to represent the defendant; (2) counsel visited the defendant on numerous occasions; (3) counsel provided lengthy and detailed investigation requests; and (4) counsel discussed possible sentences at the defendant's request. (*Id*. at p. 1245.)

The Supreme Court found no abuse of discretion in the trial court's denial of the defendant's motion, noting: "If a defendant's claimed lack of trust in, or inability to get along with, an appointed attorney were sufficient to compel appointment of substitute counsel, defendants effectively would have a veto power over any appointment, and by a process of elimination could obtain appointment of their preferred attorneys, which is certainly not the law." (*Jones*, *supra*, 29 Cal.4th at p. 1246.) Similarly, we find no abuse of discretion of the trial court's denial of defendant's *Marsden* motion. The trial court allowed defendant to present his arguments in favor of the motion, heard defense counsel's responses, and ultimately found defense counsel able to continue representing defendant. We defer to the trial court's analysis of the testimony before it.

## Review of Dependency Court Records

Defendant requests that we review Jane's dependency court records to determine whether the trial court properly ruled on his petition to discover certain records. We find no error.

**Background**

Prior to trial, defendant requested access to Jane's dependency court records. In his in limine motion, defendant stated that Jane and CW02 were placed together in foster care. Jane accused the son of her foster parent of sexual battery. The son denied the accusation and Jane was placed in another foster home. The foster mother adopted CW02. The court held a hearing on the request.

At the hearing, defense counsel stated that Jane had accused her foster parent's son, A.D., of grabbing her vaginal area. Welfare and Institutions Code section 827 makes such information confidential; defendant sought an order for formal access to A.D.'s name and the right to interview him.

A.D.'s court appointed attorney explained that A.D. did not deny the incident. A.D. was eight at the time and it was a "misunderstanding." A.D.'s attorney explained: "I think what happened happened, but to this boy who's -- I don't know. . . . And I don't think there's any dispute that the events that [Jane] claimed happened happened. I think there was just a very different view on it based on . . . who was there and the age." The trial court agreed to review the relevant confidential records and determine whether they should be disclosed to defense counsel.

Defense counsel argued: "The argument for the Defense is going to be is that if, in fact, this allegation was true, you can bet the minor victim's sister [CW02] would have been moved out of the foster home as well." Thus, the evidence that Jane made an accusation against A.D. reflected on her credibility.

The trial court, after reviewing the documents in camera, issued the following ruling: "On 2/2/12 with the authority of the Presiding Judge and the Juvenile Court

15

Judge this court conducted an in camera review of the CPS files referenced to this matter. After weighing th[e] best interest of the minors and the information contained within the reviewed files the court declines to order the records be provided to counsel in the matter of People v Snow. The court orders the documents reviewed in camera be placed in the file identified as CONFIDENTIAL NOT TO BE OPENED EXCEPT BY COURT ORDER."

**Discussion**

Defendant contends the trial court's refusal to release the information potentially violated his right to present a defense. He requests that we review the documents to determine whether the trial court erred in refusing to disclose them to the defense.

A prior false accusation of sexual molestation is relevant to the issue of a victim's credibility. Such evidence is admissible under Evidence Code section 1103, subdivision (a)(1). (*People v. Franklin* (1994) 25 Cal.App.4th 328, 335-336.) The trial court possesses the discretion, under Evidence Code section 352, to exclude evidence of prior reports of sexual assault if such evidence would consume considerable time and divert the jury from the crimes charged at trial. (*People v. Miranda* (2011) 199 Cal.App.4th 1403, 1424.)

The People oppose defendant's request that we review the sealed records, arguing A.D.'s attorney testified A.D. did not deny the incident occurred and defendant forfeited the issue by failing to object in the trial court. However, without reviewing the sealed documents we cannot assess either contention.

Confidentiality gives way when the requested information facilitates the pursuit of facts and the goal of a fair trial. (*Pitchess v. Superior Court* (1974) 11 Cal.3d 531, 536-537.) Confidential files may be disclosed if defense counsel makes a plausible justification for disclosure or a good cause showing of a need for the documents. (*Alford v. Superior Court* (2003) 29 Cal.4th 1033, 1045.) The trial court reviews the

16

confidential documents in camera to determine whether or not disclosure is warranted. (§ 1326, subd. (c).)

In turn, we review the confidential records the trial court declined to disclose to determine whether they are material only if there is a reasonable probability that had the evidence been disclosed, the result of the trial would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the trial. (*People v. Martinez* (2009) 47 Cal.4th 399, 453-454.)

Our review of the confidential records reveals no material evidence that should have been disclosed to the defense.

## Instructional Error

### Instruction on Intent

Defendant argues the trial court erred in instructing the jury on the intent required to find him guilty of continuous sexual abuse of a child. Defendant notes that it is a general intent crime if the jury finds a defendant committed three acts of substantial conduct, but it is a specific intent crime if the jury bases its verdict on the theory that defendant committed three acts of lewd and lascivious conduct. He argues the trial court should not have instructed with CALCRIM Nos. 1120 and 250. We are not persuaded.

#### *Background*

During the discussion of jury instructions, the parties considered whether the crime of continuous sexual abuse is a general or specific intent crime. The prosecution believed it was a general intent crime. However, the court noted that CALCRIM No. 1120, the instruction setting forth the elements, "appears to say that it's with intent to sexually arouse the perpetrator or the child." Defense counsel agreed.

Later, the court stated, "with regards to the [section] 288.5, I think that the instruction is pretty clear that some judges do instruct on specific intent, and it's included in the instruction itself under lewd and lascivious conduct. So I don't know that we need any additional instruction on that issue." Defense counsel asked whether a general intent

17

instruction was required. The trial court responded: "Yeah. And, clearly, in this note it says that continuous sexual abuse does not necessarily require specific intent, while lewd and lascivious conduct always does."

The court instructed on the crime of continuous abuse of a child with a version of CALCRIM No. 1120: "The defendant is charged with continuous sexual abuse of a child under the age of 14 years in violation of Penal Code section 288.5(a).

"To prove that the defendant is guilty of this crime, the People must prove that:

"1. The defendant lived in the same home with/or had recurring access to a minor child;

"2. The defendant engaged in three or more acts of substantial sexual conduct/or lewd or lascivious conduct with the child;

"3. Three or more months passed between the first and last acts;

"AND

"4. The child was under the age of 14 years at the time of the acts.

"Substantial sexual conduct can be masturbation of either the child or the perpetrator[.]

"Lewd or lascivious conduct is any willful touching of a child accomplished with the intent to sexually arouse the perpetrator or the child. The touching need not be done in a lewd or sexual manner. Contact with the child's bare skin or private parts is not required. Any part of the child's body or the clothes the child is wearing may be touched. Lewd or lascivious conduct also includes causing a child to touch his or her own body or someone else's body at the instigation of a perpetrator who has the required intent.

"Someone commits an act willfully when he or she does it willingly or on purpose. It is not required that he or she intend to break the law, hurt someone else, or gain any advantage.

18

"You cannot convict the defendant unless all of you agree that he/she committed three or more acts over a period of at least three months, but you do not all need to agree on which three acts were committed.

"Actually arousing, appealing to, or gratifying the lust, passions, or sexual desires of the perpetrator or child is not required for lewd or lascivious conduct.

"It is not a defense that the child may have consented to the act.

"Under the law, a person becomes one year older as soon as the first minute of his or her birthday has begun.

"Conviction of a sexual assault crime may be based on the testimony of a complaining witness alone." (Original brackets and parentheses omitted.)

In addition, the court instructed with a modified version of CALCRIM No. 250: "The crime charged in this case requires proof of the union, or joint operation, of act and wrongful intent.

"For you to find a person guilty of the crime of Continuous Sexual Abuse, that person must not only commit the prohibited act or fail to do the required act, but must do so with wrongful intent. A person acts with wrongful intent when he or she intentionally does a prohibited act or fails to do a required act; however, it is not required that he or she intend to break the law. The *act or intent* required is explained in the instruction for that crime or allegation." (Italics added; original brackets omitted.)

On the issue of intent, the court further instructed with CALCRIM No. 225: "The People must prove not only that the defendant did the acts charged, but also that he/~~she~~ acted with a particular intent/ and/or mental state. The instruction for the crime explains the intent/ and/or mental state required.

"An intent/ and/or mental state may be proved by circumstantial evidence." (Original parentheses and brackets omitted.)

19

*Discussion*

Section 288.5 requires that the defendant must have engaged in three or more acts of "substantial sexual conduct" with a child, or have engaged in three or more acts of "lewd or lascivious conduct" with a child. "[T]he 'lewd or lascivious conduct' aspect of section 288.5 requires the specific intent of sexual gratification, but the 'substantial sexual conduct' aspect does not." (*People v. Whitham* (1995) 38 Cal.App.4th 1282, 1294.)

However, the court's instructions, defendant contends, could have allowed the jury to find him guilty of violating section 288.5 under the lewd or lascivious conduct aspect without finding he had the specific intent of sexual gratification. According to defendant, the court's version of CALCRIM No. 250 told the jury that a violation of section 288.5 was a "general-intent crime regardless of whether the underlying conduct was substantial sexual conduct or lewd and lascivious conduct."

Defendant argues: "The trial court may not have come out and expressly told the jury that. However, that was the inference a reasonable juror would draw from reading or hearing CALCRIM 250. By ubiquitously referring to the crime of continuous sexual abuse as a general intent crime without differentiating between the two types of conduct that can underlie the offense, CALCRIM 250 led the jury to believe that the crime is always a general intent offense."

The court must instruct, even in the absence of a request, on the general principles of law relevant to the issues raised by the evidence. These general principles refer to those principles closely and openly connected with the facts before the court and that are necessary to the jury's understanding of the case. (*People v. Sedeno* (1974) 10 Cal.3d 703, 715.) We consider the instructions as a whole to determine whether they correctly state the law. (*People v. Campos* (2007) 156 Cal.App.4th 1228, 1237 (*Campos*).)

Here, the court instructed with CALCRIM No. 1120, which states that lewd or lascivious conduct "is any willful touching of a child accomplished with the intent to

20

sexually arouse the perpetrator or the child." CALCRIM No. 1120 told the jury that lewd or lascivious conduct requires specific intent. The court modified CALCRIM No. 250 to state that "the act or intent required [for the crime charged] is explained in the instruction for that crime." CALCRIM No. 250, as modified, did not, as defendant insists, tell the jurors that the crime of continuous sexual abuse is always a general intent crime. Instead, the phrase "act or intent" explained that defendant could commit continuous sexual abuse by performing a prohibited act, "substantial sexual conduct," or by committing an act with a prohibited intent, lewd or lascivious conduct as defined in CALCRIM No. 1120. We do not find the instructions as given ambiguous or misleading, and we presume the jurors understood and followed the court's instructions. (*Campos*, *supra*, 156 Cal.App.4th at p. 1237; *People v. Wilson* (2008) 44 Cal.4th 758, 803.)

### Unanimity Instruction

Defendant contends the trial court's instructions violated his constitutional right to a unanimous jury verdict. Although defendant concedes this argument has been rejected in several appellate decisions, including our opinion in *People v. Higgins* (1992) 9 Cal.App.4th 294, he urges us to reject this precedent.

Defendant cites *Richardson v. United States* (1999) 526 U.S. 813 [143 L.Ed.2d 985] in support of his argument that the court erred in failing to give a unanimity instruction and infringed on his constitutional right to a unanimous verdict. However, the court in *People v. Cissna* (2010) 182 Cal.App.4th 1105 rejected this very argument. The court held: "In *Richardson*, the court, as a matter of statutory interpretation, concluded that a federal offense requiring a series of drug offenses to prove a continuing criminal enterprise required unanimous agreement as to which three specific drug transactions supported the conviction. [Citation.] In reaching this conclusion, *Richardson* noted that 'the Constitution itself limits a State's power to define crimes in ways that would permit juries to convict while disagreeing about means, at least where that definition risks serious unfairness and lacks support in history or tradition.' [Citation.] However, citing

21

and distinguishing the *Gear* decision, the *Richardson* court recognized that this constitutional concern did not necessarily apply to state statutes that involved difficult problems of proof. *Richardson* noted that state statutes that permit conviction for sexual abuse of a minor based on a continuous course of conduct 'may well respond to special difficulties of proving underlying criminal acts [citation] which difficulties are absent here.' [Citation.] Thus, *Richardson* supports the constitutionality of the continuous-course-of-conduct exception applied by the Legislature in section 288.5, subdivision (b). [Citations.]" (*Cissna*, at pp. 1125-1126, citing *People v. Gear* (1993) 19 Cal.App.4th 86, 90-92.) Accordingly, we find no error.

## Failure to Instruct Regarding Weighing Conflicting Testimony

Defendant faults the trial court for failing to instruct sua sponte pursuant to CALCRIM No. 302, which discusses weighing conflicting witness testimony. This failure, defendant asserts, was prejudicial. We disagree.

CALCRIM No. 302 states: "If you determine there is a conflict in the evidence, you must decide what evidence, if any, to believe. Do not simply count the number of witnesses who agree or disagree on a point and accept the testimony of the greater number of witnesses. On the other hand, do not disregard the testimony of any witness without a reason or because of prejudice or a desire to favor one side or the other. What is important is whether the testimony or any other evidence convinces you, not just the number of witnesses who testify about a certain point."

CALCRIM No. 302 must be given as an instruction in a criminal case in which there is conflicting testimony. (*People v. Anderson* (2007) 152 Cal.App.4th 919, 939.) A court's failure to so instruct is prejudicial only where there is a reasonable likelihood the error caused juror misunderstanding. In applying this standard, we consider the record as a whole and the totality of the court's instructions. (*People v. Snead* (1993) 20 Cal.App.4th 1088, 1097 (*Snead*), overruled on other grounds in *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 181.)

22

The People concede that the court should have instructed with CALCRIM No. 302, since there was conflicting testimony at trial. However, the People argue the error did not result in prejudice. We agree.

In *Snead*, the court found a similar failure to instruct pursuant to CALCRIM No. 302's predecessor, CALJIC No. 2.22, not prejudicial. The *Snead* court determined the trial court had instructed the jury with other standard instructions providing guidance to the jury in its consideration and evaluation of the evidence. (*Snead*, *supra*, 20 Cal.App.4th at p. 1097.) Here, the trial court also provided numerous instructions on reasonable doubt, evidence, direct and circumstantial evidence: defined, circumstantial evidence: sufficiency of the evidence, and single witness testimony. (CALCRIM Nos. 220, 222, 223, 224, 301.)

In addition, the court instructed with CALCRIM No. 226, which states in part: "Do not automatically reject testimony just because of inconsistencies or conflicts. Consider whether the differences are important or not. People sometimes honestly forget things or make mistakes about what they remember. Also, two people may witness the same event yet see or hear it differently." Given the court's instructions, we find no reasonable likelihood that the failure to give CALCRIM No. 302 caused juror misunderstanding.

## Ability to Pay Presentence Report Fee

Finally, defendant argues the trial court erred in ordering him to pay the cost of the probation officer's presentence report. According to defendant, insufficient evidence supports his ability to pay the fee.

**Background**

The probation officer's report recommended that the court "find the defendant is able to pay for the costs of the probation report in the amount of $460.00 pursuant to § 1203.1b of the Penal Code." At sentencing, the trial court stated it had reviewed the probation report and ordered defendant to pay the $460 fee. Defendant did not object to

23

the order. Defendant forfeited his right to raise the issue by failing to object in the trial court.

**Discussion**

Defendant outlines the procedure codified in section 1203.1b, requiring the probation officer to inquire as to a defendant's ability to pay costs, and to inform the defendant that he or she is entitled to a hearing in which the court will determine the defendant's ability to pay and the payment amount. He cites *People v. Pacheco* (2010) 187 Cal.App.4th 1392, 1401 (*Pacheco*), overruled on other grounds in *People v. McCullough* (2013) 56 Cal.4th 589, 599, which reversed an order to pay the cost of a monthly probation supervision fee due to the trial court's failure to determine the defendant's ability to pay. The *Pacheco* court also concluded that a defendant need not object in the trial court to preserve the issue on appeal. (*Id.* at p. 1397.) However, defendant also acknowledges that *People v. Valtakis* (2003) 105 Cal.App.4th 1066 reached a different result.

In *People v. McCullough* (2013) 56 Cal.4th 589, 599 (*McCullough*), the Supreme Court disapproved *Pacheco*. *McCullough* held that the defendant forfeited his challenge to the sufficiency of the evidence supporting the finding that he had the ability to pay a jail booking fee by failing to object in the trial court. (*People v. Snow* (2013) 219 Cal.App.4th 1148, 1151 (*Snow*).)

Defendant argues that *McCullough* is inapplicable because it "did not address the issue of whether objection below is required to challenge an order requiring the defendant to pay the cost of a presentence report without the determination of the ability to pay." However, in *Snow* we addressed this specific issue. The defendant in *Snow* claimed insufficient evidence supported his ability to pay a presentence report fee. Defense counsel failed to object to the imposition of the fee. (*Snow*, *supra*, 219 Cal.App.4th at pp. 1149-1150.) As we stated in *Snow*, "[b]ased on the reasoning of *McCullough*, we conclude that defendant forfeited his challenge to the cost of the probation report . . .

24

and monthly supervision . . . imposed pursuant to Penal Code section 1203.1b." (*Snow*, at p. 1151.)  We decline defendant's request that we reconsider our analysis in *Snow*.

**DISPOSITION**

The judgment is affirmed.

        RAYE        , P. J.

We concur:

      ROBIE      , J.

      MAURO      , J.