Filed 3/2/16  P. v. Delgado CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B263447 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA419477) |
| v. | |
| ANDY DELGADO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Robert D. Perry, Judge.  Affirmed.

Vanessa Place, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul Roadarmel, Jr. and Amanda V. Lopez, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Andy Delgado (defendant) appeals from his sexual assault convictions. He contends that the trial court's comments in response to a jury question incorrectly stated the law and created an improperly directed verdict or mandatory presumption. Finding no merit to defendant's contention, we affirm the judgment.

## BACKGROUND

Defendant was charged with having committed six felony offenses against Ana H. (Ana), as follows: count 1, forcible oral copulation in violation of Penal Code section 288a, subdivision (c)(2)(A);[1] count 2, sodomy by use of force in violation of section 286, subdivision (c)(2)(A); count 3, assault with a firearm in violation of section 245, subdivision (a)(2); count 4, corporal injury to the mother of defendant's child, in violation of section 273.5, subdivision (a); count 5, forcible oral copulation in violation of section 288a, subdivision (c)(2)(A); and count 6, forcible rape in violation of section 261, subdivision (a)(2). The information alleged (counts 1 & 2) that defendant had personally used a dangerous or deadly weapon in the commission of the offenses, within the meaning of section 667.61, subdivisions (b) and (e), and that he had personally used a firearm within the meaning of section 12022.53, subdivision (b).

A jury convicted defendant of counts 4, 5, and 6, as charged, and found him not guilty of counts 1, 2, and 3. On April 15, 2015, the trial court sentenced defendant to a total prison term of 15 years, comprised of the middle term of three years as to count 4, and the full middle term of six years as to each of counts 5 and 6, all to run consecutively. Defendant was ordered to pay mandatory fines and fees, and was awarded 559 days of presentence custody credit, which included 486 days of actual custody time and 73 days of conduct credit. Defendant filed a timely notice of appeal from the judgment.

---

[1]     All further statutory references are to the Penal Code, unless otherwise indicated.

**Prosecution evidence**

### Defendant's relationship with victim

Ana testified that she had been in a relationship with defendant on and off for four years until December 2013. The two began dating when Ana was 17 years old and in the 10th grade. They became intimate and engaged in consensual sex. The relationship became difficult after Ana discovered that defendant was involved with another woman (Jackie) in February 2010. After defendant claimed he had ended his relationship with Jackie, Ana gave him another chance, and in 2012, Ana gave birth to their son Damian. Three months before Damian was born, Jackie gave birth to defendant's other son, Andrew.

### 2011 incidents

Ana testified that defendant first hit her sometime in 2011, after defendant had seen the number of male friends listed in Ana's cell phone. Ana did not report the incident to the police or to her father. Ana described another incident in 2011 when defendant became upset while they were alone in his car. Defendant pulled her hair and choked her with his hand, injuring her neck. When Ana sought treatment for her sprained neck, she discovered she was pregnant. The next day, Ana's father was arrested for stabbing defendant, which prompted Ana to report defendant's assault and her neck injury to the police. Ana also obtained a restraining order against defendant despite remaining in the relationship.

### October 2013 incident (counts 1, 2 & 3)

Ana testified that on October 15, 2013, when she was attending a local university, defendant asked her to meet. Though Ana was afraid to be alone with him, she agreed to meet on campus, outside a Starbuck's coffee shop. According to Ana, defendant repeatedly blamed her for their problems, displayed a gun tucked in his waistband, told her to get in the car, and claimed he had Damian. As defendant drove, he placed the gun barrel against Ana's leg and threatened to shoot her. He then parked in an isolated spot, hit her several times in the face with the gun, and then forced her to orally copulate him as he held the gun to the back of her head. Defendant then drove to his apartment, pulled

3

Ana out of the car and pushed her inside, where he threatened to kill her, pulled her hair, slammed her head on the wall several times, and then said he was in love with her and intended to teach her a lesson.

Ana testified that over a period of approximately three hours, defendant forcibly sodomized her several times, placed his penis into her vagina and into her mouth, and told Ana that he loved her, but that what he was doing was her fault, because she upset him. Defendant then told Ana to shower, and once his parents arrived, he took her to eat and then home. Ana put makeup on her bruises, told her family that a tennis ball had hit her in the mouth, and did not report the incident to the police. A few days later, she and Damian went with defendant to a pumpkin patch, where they had a photograph taken. Ana explained that she stayed with defendant because she did not have anyone else.

### December 2013 incident (Counts 4, 5 & 6)

On December 16, 2013, defendant asked to see Damian, and Ana agreed to meet at the park after work. As she was walking to the bus stop shortly after 1:00 p.m. to pick up Damian, defendant appeared behind her and said he would drive her. Ana was reluctant to get into the car until defendant lifted his shirt and opened the glove compartment to show that he was not armed. Once Ana was in the car, defendant took her phone from her, drove to his apartment building, parked, and examined the phone. When defendant found a conversation between Ana and a male friend, he said, "You stupid bitch," told her she had not learned her lesson, and punched her in the face multiple times in quick succession, causing her to bleed on her clothing. Defendant also head-bumped her, choked her, and threatened to make her jump off the building. Defendant then pulled Ana out of the car and forced her into the apartment.

Once inside, defendant brought Ana ice bags for her face. Defendant cried, told her he had not wanted to do that, and that it was her fault. When Ana cried uncontrollably after seeing her face in the bathroom mirror, defendant picked her up from the bathroom floor, hugged her, said that everything was going to be okay, and then he pushed her onto the bed face down. Ana asked him not to do it again, meaning anal penetration, and defendant placed his penis into her vagina. Ana did not tell him to stop

4

because she wanted to go home, but after a few minutes, she told defendant she was in pain. Defendant stopped, brought Ana some painkillers from the kitchen, and told her to put his penis in her mouth to show him that he was the only one. Ana was still in pain but complied, believing it was the only way she would be able to go home. In an effort to prevent defendant from becoming more aggressive, Ana falsely assured him that everything was going to be okay, they would fix everything, and they would be together. Ana did not try to push defendant away as he penetrated her vagina with his penis two more times that afternoon and placed it into her mouth once more.

Defendant stopped his assault at 4:30 p.m., just before his father came home. Ana put her clothes back on, covering her face with a hoodie provided by defendant. After defendant drove Ana home she told her mother and sisters that he had hit her, but did not tell them about the sexual assault because she was ashamed. Ana locked herself in the bathroom, called a friend, who arrived within 10 minutes and advised her not to wash her face, shower, or change clothes. Another friend called the police, and Ana told them about that day's assault and the October assault. The police took Ana to be examined by a rape center nurse and to the emergency room to be treated, before transporting her to the police station where her injuries were photographed. Ana suffered a fractured cheekbone, bruising around her mouth, chin, and forehead, cut lips, and a concussion.

Prior to trial, Ana told defense counsel that defendant could have thought that she was consenting to sex. Ana testified that she had consented to having sex with defendant a few days before the December assault; however, she did not consent to the sodomy or oral copulation on October 15, 2013, or to the vaginal penetration or the oral copulation on December 16, 2013. Ana also testified that defendant often asked her to make "hickies" on him and that she complied with his request while having sex in December 2013.[2]

---

[2]    It was not clear from Ana's testimony whether the hickies were given during the assault of December 16 or the earlier consensual sex.

5

*Jailhouse conversations*

A few days following his arrest, defendant began telephoning Ana daily from jail and writing her letters. Excerpts of the monitored and recorded telephone calls were played for the jury. An attorney suggested to defendant that his sentence would be reduced if Ana testified that she had consented to the sexual acts charged against him. Defendant asked Ana to say that she had consented. She agreed to consider it. In the recorded conversations, defendant apologized to Ana for hitting her, told her he loved her, acknowledged that he was to blame, but did not expressly mention the sexual assaults.

In October 2014, when Ana took Damian to visit defendant in jail, defendant placed a handwritten note against the glass window of the visiting area. The note read: "Keep lying if I ever want to get out soon. I need you to please lie for me if you . . .want me to get out sooner. I love you regardless." Deputy Sheriff Jose Martel testified that just before he returned defendant to his jail ward after the visit, he saw defendant grab the note and put it in his pocket. Deputy Martel retrieved it and contacted Los Angeles Police Department.

*Physical examinations*

Forensic nurse Lizette Paniagua-Castro testified that she examined Ana on December 17, 2013. She observed bruising, redness and swelling on her forehead, right chin, inner ear, and chest wall, as well as a sprained finger. Nurse Paniagua-Castro noted tenderness throughout the hymenal tissue at the opening of the vaginal canal, but no tears or injuries, and no anal injuries. She explained that absence of injuries was not determinative of whether sexual intercourse was forced or consensual.

Defendant underwent a forensic examination by Nurse Kari Ross on December 17, 2013. Nurse Ross testified that she collected swabs and observed preexisting suction injuries (hickies) on both of defendant's shoulders. Officer Denward Chin testified that he saw hickies on defendant's collarbone area when defendant was arrested. A later DNA analysis revealed defendant's DNA on a vaginal swab taken from Ana.

6

**Defense evidence**

Defendant testified that he first suspected Ana was cheating on him or lying to him in 2011, when they were working at the same restaurant. One night in mid-2011, he was displeased after seeing something on Facebook that made him suspicious, so he questioned her about it as he drove her home. He demanded to see her phone and discovered that she had called Jose, her ex-boyfriend. Defendant claimed he put Ana in a headlock only after she jumped into the driver's seat and caused him to swerve, but denied hitting her.

After defendant dropped off Ana, her father attacked and stabbed defendant. While he was in the hospital Ana obtained a restraining order, which defendant viewed as a betrayal; however a few days later, Ana explained that she obtained the order to help her father. Defendant claimed he was charged with domestic battery, false imprisonment, and brandishing a weapon, all because Ana had lied, and he again felt betrayed. Even though he believed he had done nothing wrong, defendant pled guilty to one count of misdemeanor domestic battery in order to avoid conviction on all charges, and he was placed on probation with the condition he attend domestic violence classes. During 2012, while still on probation and attending his domestic violence classes, defendant slapped Ana twice. Defendant explained that he was angry that her accusations had led to his conviction, which then prevented him from remaining in school.

In October 2013, their relationship was "bumpy" and they had arguments. Defendant explained that he felt insecure because he needed to decide whether to spend the rest of his life with Ana, but was unsure because he did not want to be betrayed and lied to again. Defendant became upset when he discovered that Ana had texted a man in Washington, and so he took away her phone. Defendant claimed that by October 15, 2013, however, they had no problems and there was no "grand incident" on that date. Defendant merely drove Ana to and from school. He did not have a gun and did not "smash" her in the face with a gun. He denied having her orally copulate him and claimed he did not sodomize her. On October 20, they went to the pumpkin patch, were photographed together, and had a happy family day.

7

Defendant testified that in December 2013, defendant and Ana were still together as boyfriend and girlfriend. When they had sex on December 13, she did not give him hickies. On December 16, although he was high on methamphetamine, he picked up Ana from school at 1:00 p.m. as usual. Ana got into the car voluntarily, and he asked her whether she had been talking to anyone besides him. Defendant explained that he questioned her because he wanted to propose to her in 2014, make a life with her, but all her little lies held him back. He testified that when Ana denied talking to others, he replied, "Are you sure? I just want to know," causing Ana to throw her phone at him and give him the password. When defendant found the name of Ana's high school crush and realized she had been exchanging messages with him, he again felt betrayed. Defendant explained that he felt like "the whole world just came down again. [She] just lied to my face about it, you know."

Defendant lost his temper, backhanded Ana a few times, and then punched her "full force" with both hands, about seven or eight times. Defendant testified that he was afraid that he had caused more damage than appeared. Ana's lip was bleeding, she sobbed, and she appeared to be "devastated." Defendant denied that he pushed or dragged Ana into his apartment. He claimed that she wanted to go inside to wash her face, and that she walked on her own, ahead of defendant. Defendant also denied saying anything to Ana about having her commit suicide from the building, adding that there was no roof access.

Once inside the apartment, defendant saw Ana's black eye and bruised lip, ran to the kitchen to get an ice pack, and brought it to her in the bathroom. Ana saw herself in the mirror and cried. When defendant said he was sorry, Ana continued to cry, but hugged him, kissed him, and said she would always be there no matter what. They started "making out" and ended up on his mother's bed having vaginal sex. They had sex three times that afternoon and both had oral sex, during which Ana never said anything. Ana gave him hickies, even though he had always asked her not to do that.

Ana's father called her around 4:00 p.m. asking where she was, and Ana asked him to pick up Damian if she was not home by 4:30. At 4:30 p.m., Ana asked defendant

8

to pick up Damian so that her family would not see her bruises. Defendant refused because he was still high, and did want to be around Damian in that condition. When defendant's parents came home around 5:00 p.m., Ana said nothing to them. Defendant offered to drive Ana home, but she asked him to wait a little longer because she wanted to lie down. Defendant took her home around 5:45 or 6:00 p.m.

The police arrested defendant later that night, which he expected. Defendant was surprised however, by all the sex-related charges. Knowing that his telephone calls from jail were recorded, defendant called Ana, told her that they were trying to give him 15 years to life, and asked, "Can you please go do something about it?" and, "Can you go drop them?" Defendant explained that by "drop them" he meant the sexual assault charges. Defendant admitted that the note the deputy saw him put in his pocket was the same note he had placed against the glass, which read, "I need you to please lie for me if you want me to get out sooner." Defendant denied that he meant for Ana to lie about the sexual assault.

Defendant testified that the day before, after the jury left the courtroom, and while Ana was on the stand, she mouthed, "I hate you" to him. Defendant denied that he hated Ana. He was upset that she had to go through this, but he was also upset that she lied about the "sex stuff."

**Instructions regarding rape, consent, and duress**

Among other instructions, the trial court modified and read CALCRIM No. 1000 as follows:

> "The defendant is charged in count 6 with rape by force in violation of Penal Code section 261(A). To prove that the defendant is guilty of this crime, the People must prove that: 1. The defendant had sexual intercourse with a woman; 2. He and the woman were not married to each other at the time of the intercourse; 3. The woman did not consent to the intercourse; and 4. The defendant accomplished the intercourse by force, violence, duress, menace, or fear of immediate and unlawful bodily injury to the woman or to someone else. The defendant is not guilty of rape if he actually and reasonably believed that the woman consented to the intercourse and actually and reasonably believed that she consented throughout the act of intercourse. The People have the burden of proving

9

beyond a reasonable doubt that the defendant did not actually and reasonably believe that the woman consented. If the People have not met this burden, you must find the defendant not guilty."

The trial court then read CALCRIM No. 1015 which gave a similar instruction regarding forcible oral copulation. In addition, as read by the trial court, CALCRIM No. 1015 defined and explained consent, force, duress, menace, and fear, as follows:

"In order to consent, a person must act freely and voluntarily and know the nature of the act. Evidence that the defendant and the person dated is not enough by itself to constitute consent. An act is accomplished by force if a person uses enough physical force to overcome the other person's will. Duress means a direct or implied threat of force, violence, danger, hardship, or retribution that causes a reasonable person to do or submit to something that she would not otherwise do or submit to. When deciding whether . . . the act was accomplished by duress, consider all the circumstances, including the age of the other person and her relationship to the defendant. Menace means a threat, statement, or act showing an intent to injure someone. An act is accomplished by fear if the other person is actually and reasonably afraid or she is actually but unreasonably afraid and the defendant knows of his or her fear and takes advantage of it."

**The jury question regarding rape, consent, and duress**

During deliberations, the jury sent the court the following question: "We seem to be finding a contradiction between the definition of <u>rape</u> given on pg. 11 section 1000 for finding guilt and the definition of <u>duress</u> given on pg. 11 section 1015 (and other sections). If defendant reasonably believed the woman was consenting, but she only made him feel that way because she was under duress, would one charge trump the other?"

**The trial court's response**

Defense counsel asked the court to answer "yes" to the question and to refer the jury back to CALCRIM No. 1000, without giving further explanation. Because the jury appeared to be confused about the concepts of reasonable belief and duress, the court informed counsel that it would review the elements of rape, read the definition of duress,

10

explain that the definition in CALCRIM No. 1015 applied to the rape charge, and explain the concepts of direct and implied.

The trial court began by reading the jury question and the four elements of rape as set forth in CALCRIM No. 1000. The court then said: "Now, the duress that is spoken about in instruction 1000 is defined in the next instruction . . . 1015, the sixth paragraph . . . ." The court read the definition of duress from CALCRIM No. 1015, including the instruction to "consider all the circumstances, including the age of the other person and her relationship to the defendant." The court then added its own explanation:

> "So to me, duress means forcing somebody to do something that he or she doesn't want to do. I mean, it's pretty simple. Okay? Now, direct or implied is something I wanted to talk about very briefly. The definition of duress says, 'means a direct or implied threat of force.' Well, a direct threat of force would be a man hits a woman and she does something she doesn't want to do because he hit her. That would be a direct use of force. An implied threat of force is the man threatens to hit the woman and she does something that she wouldn't have done if he hadn't threatened her. So that's direct and implied. I think most -- most persons know what direct or implied would mean."

The court then went back to CALCRIM No. 1000 and reread the last paragraph, regarding consent and the People's burden, after which the court added:

> "So again, the requirement is on the People to prove that the defendant's belief was not actual and reasonable that the woman was consenting. And it's not what's in her mind, it's what's in his mind. Okay? And when you consider all the evidence in this case and you judge all the evidence, in light of your reason and your common sense -- now, you have how many years of accumulated life experience in this jury? Each one of you have lived a long time and you have formed beliefs as to what is reasonable and what is not. And the law does not really allow a court to further define the word 'reasonable.' It's up to you folks to define it. But when you consider all the evidence in this case and you weigh that evidence in light of your reason and common sense, the question to me becomes, did the defendant actually and reasonably believe that Ana freely consented to the intercourse that they engaged in? That's the question. And I can't do anything more than tell you that's what the question is and it's up to you folks to decide what's reasonable and what isn't, but you do

so looking at all the evidence in the case, not just one piece of evidence, and use your reason and your common sense."

## DISCUSSION

Defendant contends that the trial court gave erroneous instructions which had the effect of eliminating his "*Mayberry* defense"[3] from the jury's consideration.

"The independent or de novo standard of review is applicable in assessing whether instructions correctly state the law [citations] and also whether instructions effectively direct a finding adverse to a defendant by removing an issue from the jury's consideration [citations]." (*People v. Posey* (2004) 32 Cal.4th 193, 218.)

"The *Mayberry* defense has two components, one subjective, and one objective. The subjective component asks whether the defendant honestly and in good faith, albeit mistakenly, believed that the victim consented to sexual intercourse. . . . [¶] . . . [T]he objective component . . . asks whether the defendant's mistake regarding consent was reasonable under the circumstances. Thus, regardless of how strongly a defendant may subjectively believe a person has consented to sexual intercourse, that belief must be formed under circumstances society will tolerate as reasonable in order for the defendant to have adduced substantial evidence giving rise to a *Mayberry* instruction. [Citations.]" (*People v. Williams* (1992) 4 Cal.4th 354, 360-361 (*Williams*); see also *Mayberry*, *supra*, 15 Cal.3d at pp. 154-155.)

The trial court twice instructed the jury with CALCRIM No. 1000, which adequately set forth the subjective and objective components of the *Mayberry* defense, and with CALCRIM No. 1015, which defined duress. Defendant does not contend that the CALCRIM instructions incorrectly stated the law, and he recognizes that a trial "court may make any comment on the evidence and the testimony and credibility of any witness as in its opinion is necessary for the proper determination of the cause." (Cal. Const., art. VI, § 10.) Rather, defendant's contention is that the trial court's added comments incorrectly stated the law and created an improperly directed verdict or mandatory

---

**3**      See *People v. Mayberry* (1975) 15 Cal.3d 143 (*Mayberry*).

12

presumption. He argues that the court's comments regarding duress essentially instructed the jury that "hitting + sex = rape" by stating that "if a man hits a woman, and she has sex with him because he hit her, that this would be direct use of force by definition."

This is not a fair reading of what the court said. Defendant has paraphrased a portion of the court's explanation to suit his argument. The court said that "duress means forcing somebody to do something that he or she *doesn't want to do*. . . . The definition of duress says, 'means a direct or implied threat of force.' Well, a direct threat of force would be a man hit a woman and she *does something she doesn't want to do because* he hit her. That would be a direct use of force." (Italics added.) The court made the comment only after rereading the following definition of duress in CALCRIM No. 1015, which defendant does not claim is incorrect: "Duress means a direct or implied threat of force, violence, danger, hardship or retribution that *causes* a reasonable person to do or submit to something that *she would not otherwise do* or submit to." (Italics added.) The court's explanation had the same effect as the CALCRIM instruction. The fact that the court used the word "because" to explain causation, whereas the CALCRIM instruction uses the word "causes," does not change the meaning. We conclude that the court's explanation of duress did not direct a verdict or create a mandatory presumption.

At most, defendant might have made the argument that it created an ambiguity, but no such argument was made. Regardless, we have independently considered the challenged instruction as a whole and in context of the entire charge, and we have found no "reasonable likelihood that the jury misunderstood and misapplied the instruction. [Citations.]" (*People v. Smithey* (1999) 20 Cal.4th 936, 963.)

Defendant also contends that the trial court erred in instructing the jurors to use their various life experiences and common sense in determining the reasonableness of defendant's belief that Ana consented to intercourse. However, the trial court did not instruct the jurors to use their common sense and experience simply to determine the reasonableness of defendant's belief; rather, the court instructed the jurors to use their life experiences and common sense to evaluate the evidence and the credibility of the witnesses in making that determination. Indeed, the court explained that there was no

13

definition of "reasonable" that it could give the jurors, and told them: "It's up to you folks to define it. But when you consider all the evidence in this case and you weigh that evidence in light of your reason and your common sense, the question to me becomes, did the defendant actually and reasonably believe that Ana freely consented to the intercourse that they engaged in?"

Defendant recognizes that a reasonable belief is one that is "formed under circumstances society will tolerate as reasonable"; but he notes that "a trier of fact is permitted to credit some portions of a witness's testimony, and not credit others." (*Williams*, *supra*, 4 Cal.4th at pp. 361, 364.) Defendant argues that considering that defendant's history of domestic violence was interspersed with occasions of consensual sex, a properly instructed trier of fact could credit some portion of Ana's testimony and not others to conclude that defendant's belief was reasonable.

The trial court did not fail, as defendant's argument suggests, to instruct the jury that a determination of reasonableness required an evaluation of the witnesses' credibility. Moreover, the trial court instructed the jury without objection with CALCRIM No. 226, which gives the jury guidance on evaluating witnesses' testimony, including the following: "In deciding whether testimony is true and accurate, use your common sense and experience." So long as a court does not instruct jurors to use their common sense and experience in finding reasonable doubt, such an instruction "merely tells [the jury] that the prism through which witnesses' credibility should be evaluated is common sense and experience." (*People v. Campos* (2007) 156 Cal.App.4th 1228, 1240.) "To tell a juror to use common sense and experience is little more than telling the juror to do what the juror cannot help but do. In approaching any issue, a juror's background, experience and reasoning must necessarily provide the backdrop for the juror's decisionmaking." (*Ibid.*) Defendant has thus failed to demonstrate error.

Regardless, if the trial court's comments had been improper or incorrect statements of law, or if they had caused confusion, we would find any such error to be harmless under both the state law standard of *People v. Watson* (1956) 46 Cal.2d 818,

14

836, as well as under the federal constitutional standard of *Chapman v. California* (1967) 386 U.S. 18, 24.

We initially observe that it is difficult to discern any prejudice, as defendant did not in fact rely on a *Mayberry* defense. Although defendant testified, we have found no testimony to the effect that he harbored *any* belief that Ana consented to intercourse, whether honest or reasonable. Defendant argues that he "did not concede the issue of his belief in her consent, and, indeed, it was the only contested issue at trial." However, the issue contested by defendant was *actual* consent; in summation, defense counsel did not argue that defendant believed there was consent or that a reasonable person would have been mistaken under the circumstances. Instead, counsel told the jury, "[W]hat happened here is that after she was hit, after he took her inside, they comforted each other and they had make-up sex."

Direct evidence was not required, as a defendant's belief may be shown by circumstantial evidence, such as equivocal conduct on the part of the victim that could have led the defendant to mistakenly believe she had consented. (*People v. Castillo* (1987) 193 Cal.App.3d 119, 126.) Defendant testified that as Ana lay sobbing on the floor, she hugged him, kissed him, and said she would always be there no matter what, and that they then "made out." Defendant also testified that Ana never said anything during their three episodes of intercourse, that he believed she was enjoying it, and that she gave him hickies, even though he had always asked her not to do that. Ana testified that she did not physically resist, did not tell defendant to stop after he pushed her onto the bed face down, but merely asked him to refrain from anal penetration, complied with defendant's order to put his penis in her mouth and to give him hickies, and falsely assured him that everything was going to be okay and they would be together.

However, overwhelming evidence demonstrated that any conduct by Ana that might be considered equivocal was the product of "force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another." (*Williams*, *supra*, 4 Cal.4th at p. 364.) Ana's equivocal conduct came after defendant had admittedly punched her "full force" in the face with both hands more than seven times.

15

Ana made it clear that she did not resist and that she falsely assured defendant because she was afraid, and she thought he would become more aggressive otherwise.

Further, overwhelming evidence shows that any belief in consent was not held by defendant honestly or in good faith. (See *Williams*, *supra*, 4 Cal.4th at pp. 360-361.) Ana testified without contradiction that defendant's beating caused her to bleed on her clothing and to suffer a fractured cheekbone, bruising around the mouth, chin and forehead, as well as cut lips and a concussion. Ana was in pain, which she told defendant before and between acts of sexual intercourse. Defendant admitted he saw that Ana was bleeding and sobbing uncontrollably, and he admitted that he was afraid that he had caused more damage than appeared. Indeed, Ana's appearance was sufficiently alarming to prompt defendant to get an ice pack for her face. Despite such circumstances, defendant did not testify or even suggest that it ever occurred to him to consider whether Ana's compliance was due to consent or was the product of fear.[4]

Indeed, defendant argues only that evidence supported a finding of actual belief, and fails to point to evidence suggesting that his belief was honest or held in good faith. Further, defendant fails to argue that any reasonable person might harbor an honest but mistaken belief in consent under the circumstances presented here, and we discern no such probability. We conclude beyond a reasonable doubt that a rational jury would have found the defendant guilty if the trial court had not explained in its own words the definition of duress, or had not instructed the jurors to use their reason, experience, and common sense in assessing credibility and recognizing reasonableness.

---

[4]     Defendant merely argues that the not guilty verdicts as to counts 1, 2, and 3 suggest that the jury questioned Ana's credibility, and thus if the trial court had not made the challenged comments, the jury would have reached an entirely different verdict on counts 5 and 6. Defendant relies on *People v. Sojka* (2011) 196 Cal.App.4th 733, 738, in support of this proposition; however, that case did not involve multiple counts. In any event, as findings cannot be inferred from a general verdict (see *United States v. Watts* (1997) 519 U.S. 148, 155; *In re Coley* (2012) 55 Cal.4th 524, 554), we do not speculate into what transpired in the jury room. (See *Yeager v. United States* (2009) 557 U.S. 110, 122.)

16

**DISPOSITION**

The judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
CHAVEZ


We concur:


_____, Acting P. J.
ASHMANN-GERST


_____, J.
HOFFSTADT

17